PAN AMERICAN WORLD AIRWAYS INC., a New York corporation, Plaintiff v. UNITED AIRCRAFT CORPORATION, a Delaware corporation, Defendant.

Certification, No. 2, 1960.

PAN AMERICAN WORLD AIRWAYS INC., a New York corporation, Plaintiff Below, Appellant, v. UNITED AIRCRAFT CORPORATION, a Delaware corporation, Defendant Below, Appellee.

Appeal, No. 3, 1960.

(*July* 13, 1960.)

SOUTHERLAND, C. J., and WOLCOTT and BRAMHALL, J. J., sitting.

*James M. Tunnell, Jr.*, and *Andrew B. Kirkpatrick, Jr.* (of Morris, Nichols, Arsht and Tunnell) and *David L. Corbin* (of Haight, Gardner, Poor and Havens, of New York City) for Appellant.

*William Prickett* (of Prickett and Prickett) for Appellee.

In the Supreme Court of the State of Delaware.

SOUTHERLAND, C. J.:

These proceedings bring up to us for review rulings of the Superior Court of New Castle County upon three issues arising in a suit brought by Pan American World Airways, Inc. against United Aircraft Corporation.

The facts are these:

Pan American is one of the world's great airlines. United is a large manufacturer of airplane engines and propellers.

In 1954, the companies were contemplating continued purchases by Pan American of United's goods, and deemed it desirable to agree upon a set of conditions applicable to such purchases. They negotiated and as of August 2, 1954, executed a contract, called the "General Terms Agreement". Its provisions apply to all orders which may be accepted by the seller from the buyer after its date, and also to orders either wholly or partially unfilled before its date.

In 1954, Pan American ordered from United a number of "governors". A governor is a device used to control in certain respects the functioning of the airplane's propeller. There was some correspondence about this order, relating to the type of governor to be supplied. Eventually, the model designated 5U18-66 was chosen and installed in aircraft operated by Pan American. These governors were not manufactured by United, but by the Woodward Governor Company, from which United purchased them.

In December, 1955, the drive gear shafts of two of these governors, installed on different aircrafts, broke while the airplanes were in flight. Serious damage resulted.

Pan American brought suit in the court below to recover for this damage. The two counts of the complaint set forth two causes of action—(1) breach of warranty of fitness, and (2) negligence in not using care in the design, selection of material, inspection and testing of the governors. After discovery proceedings United moved for summary judgment on both counts. The trial court granted judgment on the first count, holding that the General Terms Agreement had expressly disclaimed any liability for warranty of goods not manufactured by United. The court refused to grant judgment on the second count, holding that the General Terms Agreement had not exonerated United from the consequences of its own negligence. Pan American appeals from the judgment against it, and the trial court has certified to us for review its ruling on the second count.

The issues of the case turn almost entirely on the wording of Article VIII of the General Terms Agreement. Paragraphs (A) and (C) of this Article read:

"(A) Seller warrants that at the time of delivery thereof the goods manufactured by it, hereinafter referred to as 'products', will be free from defects in material and manufacture. Such warranty is limited to replacing or repairing at its shops any products which have been returned to the original point of delivery and which are demonstrated to Seller's reasonable satisfaction to have been defective at the time of delivery thereof, provided that transportation charges and any and all sales and use taxes, duties, imposts or excises thereon shall be paid by the Buyer. This warranty shall not apply (1) unless prompt written notice of any such defect is given by the Buyer to Seller within ninety (90) days after the beginning of the first flight in which the products are included or within one (1) year after the date of delivery of its products, whichever shall first occur; (2) to its products (a) which are not properly installed; (b) which are operated or maintained contrary to the then current recommendations or instructions

of Seller as stated in its overhaul manuals, service bulletins or otherwise; (c) which are repaired or altered outside Seller's plants in such a way as to impair their safety, operation or efficiency; (d) if a substitute for any part thereof not manufactured, supplied, or approved in writing by Seller for use in the operation thereof shall have been used in place of any part manufactured or supplied by Seller for such use; or (e) which have been subject to misuse, neglect or accident if the malfunctioning of the product complained of under this Article results from the happening of any of the events referred to in items (a) through (e) hereof; (3) to any labor charges of the Buyer for replacement of parts, adjustments or repairs, or any work, unless such charges be assumed or authorized in writing by Seller; or (4) to any apparatus, instrument or other trade accessory not manufactured by Seller. *This warranty is expressly accepted by the Buyer in lieu of any or all other warranties or representations, express or implied, in fact or in law arising out of the sale of the goods and of all duties or liabilities of Seller to the Buyer arising out of the use of the goods; and no agreement or understanding varying or extending the same will be binding upon Seller unless in writing, signed by a duly authorized officer of Seller.* Seller reserves the right to make changes in design or additions to or improvements in its products at any time without imposing any liability on itself to install the same in any products manufactured prior thereto. [Emphasis supplied.]

* * * * * *

"(C) Seller agrees to use its best efforts to obtain warranties from manufacturers of apparatus, instrument or other trade accessory not manufactured by Seller the benefits of which will be available to and run directly to the Buyer to the extent that such manufacturers warrant their products to the Seller."

### 1. The question of warranty.

Does the disclaimer contained in the underlined language apply to goods not manufactured by United, or does it apply only to United's own products? United contends for the former construction; Pan American for the latter.

It will be noted that the paragraph at the outset defines "the goods manufactured by" United as "products"; whereas the language of the disclaimer refers to "the goods" generally and not to "the products". This distinction suggests that the disclaimer was intended to apply to all goods sold under the contract. This is the natural reading of the language, for the difference in terminology must have some significance. And this construction of the language is, we think, the reasonable one. Pan American's contention comes to this: that United's liability for breach of warranty in respect of its own products is strictly limited by the contract to replacement or repair; whereas its liability for breach of warranty in respect of goods made by others is not limited at all by the contract. This seems highly unreasonable. Why should United, after having carefully limited its liability in respect of defects in its own products, leave itself "wide open" to liabilty in respect of defects in goods manufactured by others?

Pan American attempts to develop an argument that there is nothing unlikely, or unreasonable, in such a result, but it is wholly unconvincing.

Moreover, the provisions of paragraph (C) are inconsistent, to some extent at least, with an intent to subject United to its common-law liability of implied warranty in respect of goods of others sold by it. If United was intended to be so liable to Pan American, the additional warranty from the manufacturer would be unnecessary; whereas, if United was intended to be released from such liability, the convenant in paragraph (C) has real value to Pan American.

Such a warranty in respect of Woodward governors was actually obtained by United from Woodward. Before the General Terms Agreement was executed, Pan American inquired about Woodward's warranty of its governors to United. United then advised Pan American that Woodward's warranty of material and workmanship and of fitness ran to United's purchasers as well as to United. This was satisfactory to Pan American's counsel. He wrote that he would recommend that the goods should be excluded from the United warranty in the proposed General Terms Agreement. This seems conclusive of the matter.

Pan American advances a subsidiary contention based on an alleged express warranty given by United in respect of the governors *after* the General Terms Agreement had been executed.

The facts are these:

On March 31, 1954, Pan American ordered from United 43 model 5Y20-8 governors, for use on Douglas aircraft DC-7B. These governors are "Hamilton Standard" governors manufactured by United. Shipment was expected to be made in early 1955.

During January and February of 1955 trouble developed with these governors in testing them for use on the aircraft. On February 4, 1955, United advised Pan American that it had "placed 5Y20-8 governors in a stop-work category", and that it would have to ship 5U18 governors instead until the problem of the 5Y20's had been solved. (The 5U18 is the Woodward governor.) On February 22 United wrote that it was investigating both types, and felt sure that the program would produce a satisfactory 5Y20. Further correspondence followed. United was still unable to remedy the trouble with its 5Y20's and in reply to a request from Pan American for its recommendation said that if a final decision had to be made "today" it could only recommend the 5U18. On March

14, 1955 Pan American issued a supplemental purchase order for the 5U18 governors in lieu of the 5Y20's.

Upon this correspondence Pan American seeks to build a claim of warranty overriding the General Terms Agreement. It is said that the recommendation of the 5U18 governors was a warranty of fitness, and that the statement that the 5Y20 governor was expected to be satisfactory constituted, when United recommended the 5U18's, a warranty that those governors would be satisfactory.

The argument is highly artificial and strained. We do not read the correspondence as containing any express warranty whatever. Moreover, it is quite unreasonable to believe that the parties intended any modification of the General Terms Agreement. The correspondence was between various persons in the sales, engineering and purchasing departments of the companies. We cannot find in it any intent to override the express provisions of the General Terms Agreement. Certainly, the Pan American representatives could not reasonably have understood that United's willingness to analyze and grapple with the problems attending the selection of a type of governor indicated an intention to modify an agreement which was expressly designed to cover the whole subject of warranty of goods. *Cf. Bartlett v. Stanchfield*, 148 *Mass.* 394, 19 *N. E.* 549, 2 *L. R. A.* 625.

This contention must fail.

It follows that the judgment for defendant on Count 1 of the complaint must be affirmed.

2. The question of negligence.

As before stated, Count 2 of the complaint charges that Pan American's damages were caused by United's negligence.

Does the General Terms Agreement absolve United from the consequences of its own negligence?

The Superior Court held that the language did not so absolve United. Thereafter, it certified to us the following questions:

"(a) Whether, under the law of Connecticut, the General Terms Agreement exonerated the defendant from liability for its negligence as alleged in Count 2?

"(b) If the General Terms Agreement exonerated the defendant from responsibility for its negligence, did it contravene public policy, as a result of which it was invalid?"

Article VIII (A) is quoted above. The important language is:

"This warranty is expressly accepted by the Buyer in lieu of any or all other warranties or representations, express or implied, in fact or in law arising out of the sale of the goods and of all duties or liabilities of Seller to the Buyer arising out of the use of the goods; * * *."

United stresses the phrase—"all duties or liabilities * * * arising out of the use of the goods". The word "duties", it is said, clearly refers to tort liability, since liability in tort is predicated upon a breach of duty.

It is to be noted that the negligence charged is negligence in connection with the *sale* of the governors, not in connection with the *use* of the goods. The charge is the failure to use reasonable care "in the design, selection of material, inspection and testing" of the governors, and the failure to warn the plaintiff of the existence of defects in the goods. The disclaimer refers to a duty or liability "arising out of the use of the goods". There is certainly some doubt whether the language of the disclaimer has any application to negligence incident to the sale of the governors as distinct from their operation. *Cf. Brewster & Son v. Catalytic Construction Co.,* 17 *N. J.* 20, 109 *A.* 2d 805, 811. United's construction of the word "use" in the quoted phrase relates it to the possible

liability of United to a user of the goods who is a stranger to United. The pertinency of this suggestion we cannot follow.

. But the plain answer to United's contention on the negligence issue is that the language relied on is reasonably susceptible of a construction that relates to a contractual duty or liability only, *e.g.*, a contractual duty to respond in damages for breach of warranty. It is the general rule that contracts to relieve one from the consequences of his own negligence are not favored in the law, and if possible are construed not to confer immunity from liability. The parties are agreed that Connecticut law governs, and this is the Connecticut rule. *Parillo v. Housing Authority of New Haven*, 16 *Conn. Sup.* 106; *Fedor v. Mauwehu Council, Boy Scouts*, 21 *Conn. Sup.* 38, 143 *A.* 2d 466. The Delaware law appears to be the same. See *Marshall v. M. D. & V. Rwy. Co.*, 31 *Del.* 170, 173, 112 *A.* 526. It is obvious that the language of the disclaimer does not necessarily embrace immunity from the consequences of negligence.

United leans heavily on *Blythewood, Inc. v. Jaquish*, 2 *Conn. Sup.* 22. In that case Mrs. Jaquish had indemnified plaintiff, operator of a sanitarium, from any and all claims or liability arising out of the acceptance by the sanitarium of her husband for care and treatment. In a suit against the sanitarium for negligence causing the husband's death the sanitarium was held responsible in damages. It sued on the contract of indemnity and it was held that the liability was covered.

The case is distinguishable. Indemnity against one's own negligence is more readily to be found in a specific indemnity contract than in a contract of sale. It is often clearly within the contemplation of the parties, as in the case of the usual insurance policy indemnifying against liability arising out of the operation of a motor vehicle.

In the *Blythewood* case it could reasonably be said that indemnity against any liability for injury to the patient, no matter how caused, was within the contemplation of the contracting parties. A different situation is presented here. The parties were buying and selling goods and dealing primarily with questions of breach of warranty. The language, we think, is not sufficiently specific to exonerate United from liability for its own negligence.

Certified question (a) is answered in the negative.

Certified question (b) therefore requires no answer.

### Petition of Appellee for Reargument.

Appellee United Aircraft Corporation, the defendant below, complains in its petition for reargument of the summary treatment given in the opinion to its contention that the exoneration clause relating to the use of the goods was drafted in the light of the possible liability of United as manufacturer of the goods to the user, even though the user is a stranger to the contract of sale, under the rule of *MacPherson v. Buick Motor Co.*, 217 *N. Y.* 382, 111 *N. E.* 1050, *L. R. A.* 1916F, 696. Since the facts are that United was not the manufacturer of the goods, and Pan Am was not a stranger to the contract, we still fail to see the pertinency of the argument. The parties, United and Pan Am, had an express contract relating to the sale. The only question is whether the language of the contract should be construed as exonerating United from its own negligence.

We adhere to our opinion that the language is not broad enough to do so.

The petition for reargument is denied.