[Civ. No. 28225. Second Dist., Div. Four. Nov. 9, 1965.]

DELTA AIR LINES, INC., Plaintiff and Respondent, v. DOUGLAS AIRCRAFT COMPANY, INC., Defendant and Appellant.

Belcher, Henzie & Biegenzahn and Frank B. Belcher for Defendant and Appellant.

William G. Tucker, Richard T. Drukker and Chase, Rotchford, Downen & Drukker for Plaintiff and Respondent.

KINGSLEY, J.—This is an action for breach of warranty in the sale of a commercial airplane. The buyer recovered judgment for damage to the airplane and the vendor has appealed. For reasons set out below, we conclude that the provisions of the contract of sale effectively insulated the vendor from the liability herein sought to be imposed on it and that the judgment against it must be reversed.

In October of 1955, Delta Air Lines, Inc. (Delta), the plaintiff herein, entered into a contract with defendant Douglas Aircraft Company, Inc. (Douglas) to purchase from the latter a new DC-7 airplane, at a price of $2,250,000. Delta

received delivery of the airplane at Douglas' plant in Santa Monica, California, on November 25, 1957, and the plane was flown, by a Delta crew, to Atlanta, Georgia. Two days later, while a Delta crew was attempting to land the plane after a check flight, the nose wheel failed to function properly, causing the plane to veer off the runway with resultant damage to the craft. There were no personal injuries and, so far as this lawsuit is concerned, the only damages sought are the costs to Delta of repair of the airplane.

Delta sued for this damage, alleging breach of both express and implied warranties. Douglas defended, *inter alia,* on the basis of language in the sale contract which it claimed released it from any liability for the accident or its consequences. The trial court directed a verdict for Douglas on the express warranty count, ruled that the exculpatory clause relied on by Douglas was void as against public policy, and submitted the case to the jury on the issues of breach of implied warranty and of negligence. The jury returned a verdict for Delta in the amount of $233,881.35, and also answered four special interrogatories to the effect that (a) the damage to the airplane resulted from a breach of an implied warranty, (b) that proper notice of such breach had been given, (c) that Douglas was guilty of negligence which proximately caused the accident, and (d) that Delta was not guilty of contributory negligence.

In the view which we take of the meaning and effect of the exculpatory clause, we need not consider whether or not the special findings of breach of implied warranty, of negligence and of freedom from contributory negligence are supported by the evidence, nor do we consider whether or not, in light of *Rose* v. *Chrysler Motors Corp.* (1963) 212 Cal.App.2d 755 [23 Cal.Rptr. 185, 99 A.L.R.2d 1411], the trial court correctly withdrew the express warranty count from the jury.

The clause relied on by defendant reads as follows:

"14. WARRANTY.

"(A) Seller warrants that the aircraft, accessories, equipment and parts manufactured by Seller shall be free from:

"(1) Defects in material and workmanship furnished by Seller and used in the fabrication thereof;

"(2) Defects arising from the selection of material or process of manufacture;

"(3) Defects inherent in the design thereof in view of the state of the art on the date hereof.

"The foregoing warranty shall apply also to accessories, equipment and parts manufactured to Seller's detailed design and specifications and supplied to Seller by other manufacturers.

"(B) In cases of defects in material and workmanship, or defects arising from the selection of material or process of manufacture, such defects must become apparent in the aircraft, accessory, equipment, or part within six (6) months or one thousand (1,000) flying hours, whichever shall first expire, after delivery of the aircraft to Buyer.

"The extent of Seller's liability under this warranty as to defects in material or workmanship, and defects arising from the selection of material or the process of manufacture, is limited to the repair of such defects in the aircraft or to the repair or replacement (with a similar item free from the defect in question) of any accessory, equipment or part which is defective in any of such respects.

"(C) The extent of Seller's liability under this warranty as to defects inherent in design is limited to the correction at its expense of all such defects becoming apparent in the aircraft, accessory, equipment, or part purchased hereunder, within one (1) year or one thousand (1,000) flying hours, whichever shall first expire, but not less than eight (8) months, after the delivery of said aircraft. Seller shall make all such repairs, replacements and corrections with reasonable care and dispatch in order that the aircraft involved may not be kept out of service longer than necessary.

"(D) Seller shall, as to each defect, be relieved of all obligations and liability under this warranty if:

"(1) The aircraft is operated with any accessory, equipment or part not specifically approved by Seller and not manufactured by Seller or to Seller's design and specifications unless Buyer furnishes reasonable evidence that such installation was not a cause of the defect; provided that this provision shall not apply to any accessory, equipment or part, the use of which does not affect the safety of the aircraft;

"(2) The aircraft shall not have been operated or maintained in accordance with Seller's instructions furnished under this agreement, unless Buyer furnishes reasonable evi-

dence that such operation or maintenance, as the case may be, was not a cause of the defect;

"(3) The aircraft shall not have been operated under normal airline use, unless Buyer furnishes reasonable evidence that such operation was not a cause of the defect;

"(4) The aircraft shall have been repaired, altered or modified without Seller's approval or if the aircraft shall have been operated subsequent to its involvement in an accident, unless Buyer furnishes reasonable evidence that such repair, alteration, modification, operation or accident was not a cause of the defect, provided, however, that this limitation insofar as it relates to repairs and accidents shall not be applicable to routine repairs or replacements or minor accidents which normally occur in the operation of aircraft if such repairs or replacements are made with suitable material and according to standard practice and engineering;

"(5) Buyer does not, within the applicable period of time specified in paragraph (B) or paragraph (C) above, return the defective aircraft, accessory, equipment or part at its expense to Seller's factory at 3000 Ocean Park Boulevard, Santa Monica, California, or if return to Seller's factory is not feasible, to Buyer's base repair shop in the United States. Return to Buyer of the repaired, replaced, or corrected aircraft, accessory, equipment or part shall be at its expense. Disassembly of the aircraft to correct the defect, removal of the defective accessory, equipment or part and installation of the corrected accessory or new part and reassembly of the aircraft shall be at the Buyer's expense;

"(6) Buyer does not submit reasonable proof to Seller that the defect is due to a matter embraced within Seller's warranty hereunder.

"With respect to matters made the subject of Seller's approval under this paragraph (D), Seller's approval or disapproval thereof shall be made in writing to Buyer within thirty (30) days after Buyer's request for approval is received by Seller. In the event of disapproval, Seller shall set forth the reasons therefor in its statement of disapproval. Seller's failure to deliver to Buyer a written statement of approval or disapproval within such thirty (30) day period shall irrevocably and conclusively constitute approval by Seller of the subject matter of the particular request involved.

"(E) The warranty provided in this article and the obligations and liabilities of Seller thereunder are in lieu of and Buyer hereby waives all other warranties, guaranties, conditions or liabilities, express or implied, arising by law or otherwise (including without limitation any obligation of the Seller with respect to consequential damages) and whether or not occasioned by Seller's negligence and shall not be extended, altered or varied except by a written instrument signed by Seller and Buyer; provided, that in the event the provision relieving Seller from liability for its negligence should for any reason be held ineffective, the remainder of this paragraph (E) shall remain in full force and effect."

I

The first issue raised herein pertains to the breadth of the exculpatory clause (Paragraph (E) of the above quoted warranty provision). It is argued by Delta that the clause does not disclaim liability for negligence as a tort concept but only disclaims liability for contractual liability— *i.e.,* a negligent breach of an express or implied warranty.

The general rule in California[1] and in other states[2] is that exculpatory or indemnity clauses which attempt to free an actor from liability for his own negligence are basically valid but must be strictly construed and that failure to state an attempted exculpation or indemnity in plain, unambiguous and clear terminology will result in an interpretation that the clause was not intended to exempt the actor from liability for his own negligence.[3] Notwithstanding this rule of strict interpretation, the contract must be interpreted by the court and the intent of the parties determined. (Cf. *Harvey Machine Co.* v. *Hatzel & Buehler, Inc.* (1960) 54 Cal.2d 445, 447 [6 Cal.Rptr. 284, 353 P.2d 924].)

[1]Consult *Goldman* v. *Ecco-Phoenix Elec. Corp.* (1964) 62 Cal.2d 40 [41 Cal.Rptr. 73, 396 P.2d 377]; *Vinnell Co.* v. *Pacific Elec. Ry. Co.* (1959) 52 Cal.2d 411 [340 P.2d 604]; *Baldwin Contracting Co.* v. *Winston Steel Works, Inc.* (1965) 236 Cal.App.2d 565 [46 Cal.Rptr. 421]; *Safeway Stores, Inc.* v. *Massachusetts Bonding & Ins. Co.* (1962) 202 Cal.App.2d 99 [20 Cal.Rptr. 820].

[2]*Jacksonville Terminal Co.* v. *Railway Express Agency, Inc.* (5th Cir. 1961) 296 F.2d 256, 261; *Pan American World Airways, Inc.* v. *United Aircraft Corp.* (1960) 53 Del. 7 [163 A.2d 582]; *Alaska Airlines, Inc.* v. *Northwest Airlines, Inc.* (D.C. Alaska 1964) 228 F.Supp. 322.

[3]Cf. *Vandermark* v. *Ford Motor Co.* (1964) 61 Cal.2d 256, 262 [37 Cal.Rptr. 896, 391 P.2d 168], wherein the court held that an exculpatory clause stating that " 'This warranty is expressly in lieu of all other warranties, express or implied, and of all other obligations on the part of the Dealer' " was only an exculpation from its contractual liability.

■ The present clause includes within its provisions a statement that the buyer "waives all other . . . conditions or liabilities . . . arising by law or otherwise . . . whether or not occasioned by Seller's negligence. . . ." The reference to negligence can have no meaning unless it refers to tort negligence, for an action based on warranty may be maintained whether or not there is negligence; that is its function. Even though disclaimer clauses are to be strictly construed, still we find that this clause covers not only contractual warranty liability but also tort liability.

Secondly, Delta argues that Douglas' negligence herein was active and not passive, and that an exculpatory clause cannot disclaim liability for active negligence. We need not here attempt to define the line between active and passive negligence, nor speculate on whether the negligence which the jury found had occurred was of one type or of the other. We know of no authority for the bald statement relied on. ■ If the language used be broad enough, an actor may disclaim liability for negligence of any type. ■ We cannot see, in the language herein involved and above quoted, anything to limit the obvious breadth of the word "negligence"; consequently, we hold that the clause covered active as well as passive negligence.

## II

Next, Delta claims that, assuming the exculpatory clause is construed so as to apply to the facts of this case, it is void as against public policy.

■ As we have said above, the law does not, in general, prohibit a clear and express contract absolving an actor from his own negligence. Civil Code section 1791, as in force at the times herein involved,[4] provided that "Where any right, duty or liability would arise under a contract to sell or a sale by implication of law, it may be negatived or varied by express agreement. . . ." In *Burr* v. *Sherwin Williams Co.* (1954) 42 Cal.2d 682, 693 [268 P.2d 1041], the court stated: "The statutory implied warranties of quality can, of course, be disclaimed by the seller, provided the buyer has knowledge or is chargeable with notice of the disclaimer before the bargain is complete." ■ The present disclaimer clause is sufficiently broad to disclaim the implied warranty of fitness for the purchaser's purpose upon which Delta bases its breach of warranty cause of action.

---

[4] Superseded on January 1, 1965, by Commercial Code section 2316.

■ Furthermore, a contract which exempts one from liability for his own negligence is not necessarily invalid. In *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 96 [32 Cal.Rptr. 33, 383 P.2d 441], the court reviewed a number of exculpatory clause cases and concluded that an exculpatory provision is valid if its does not affect the "public interest." The court there stated (p. 101): ". . . no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would otherwise have placed upon the other party, . . ."

However, Delta argues that modern law, in what is commonly referred to as the field of products liability, has shown a movement away from the traditional doctrine that a manufacturer has an absolute freedom of contract and may disclaim his liability in all circumstances. Conceding that recent cases have imposed limits on the freedom to impose exculpatory clauses, we do not regard the instant case as within either the letter or the spirit of the authorities relied on.

Unlike *Greenman* v. *Yuba Power Products, Inc.* (1963) 59 Cal.2d 57 [27 Cal.Rptr. 697, 377 P.2d 897] ; *Tunkl* v. *Regents of University of California, supra* (1963) 60 Cal.2d 92, and *Henningsen* v. *Bloomfield Motors, Inc.* (1960) 32 N.J. 358 [161 A.2d 69, 75 A.L.R.2d 1], this case involves no element of personal injury; and, also, unlike *Greenman* and *Henningsen,* involves no issue of ''privity of contract.''

Perhaps more important, the case at bench involves none of the elements of inequality of bargaining on which the cited cases, and other recent cases of the same sort, have laid their stress. Delta, bargaining for the purchase and delivery of an airplane yet to be built, is hardly the pain-wracked sufferer seeking emergency admission to the hospital whose plight secured relief in *Tunkl*; it was not faced, as were *Henningsen* and *Vandermark,* with an industry-wide stock contract not open to negotiation; it is not now faced with a "fine print" clause not known to it when it signed the contract; and it did not stand as a single inexperienced individual purchaser vis-a-vis a large seller relatively indifferent to the making or not making of a single purchase.

■ It is clear from the record that Delta, one of the major airlines of the nation, with the aid of a staff of experienced executives and attorneys, had negotiated a contract with terms individual to Douglas. There is not, nor can there be, any doubt that Delta knew that the exculpatory clause

was in the contract, and that it voluntarily agreed to it. It is suggested that the contract took on an element of a "contract of adhesion" in that the clause was part of Douglas' standard form. But the clause clearly was open to negotiation,[5] and Delta was free to seek another airplane from another manufacturer on terms which (so far as this record shows) would not have included such a clause. Delta says that it preferred the Douglas plane to those of the competing manufacturers; but that fact is implicit in any purchase of a product which competes for a market—it is not the kind of compulsion to which the "adhesion" doctrine applies.

The difference between the contract before us and those involved in the cases relied on by Delta becomes apparent from the language of the leading California case on the point. In *Tunkl* v. *Regents of the University of California, supra* (1963) 60 Cal.2d 92, 98-101, the court set out the kind of transaction in which exculpatory provisions will be held invalid: "It concerns a business of a type generally thought suitable for public regulation. The party seeking exculpation is engaged in performing a service of great importance to the public, which is often a matter of practical necessity for some members of the public. The party holds himself out as willing to perform this service for any member of the public who seeks it, . . . As a result of the essential nature of the service, in the economic setting of the transaction, the party invoking exculpation possesses a decisive advantage of bargaining strength against any member of the public who seeks his services. In exercising a superior bargaining power the party confronts the public with a standardized adhesion contract of exculpation, and makes no provision whereby a purchaser may pay additional reasonable fees and obtain protection against negligence. Finally, as a result of the transaction, the person or property of the purchaser is placed under the control of the seller, subject to the risk of carelessness by the seller or his agents."

---

[5]Mr. Hall, the head of the legal department at Douglas, testified that, in negotiating contracts with prospective purchasers, there were discussions as to the inclusion or exclusion of the exculpatory clause. He indicated that purchasers frequently asked that the clause be removed, and that Douglas' normal reply was that " 'We will take it out only at an increase in price.' " Mr. Hall testified that he personally made such an offer to Pan American on a DC-7C in 1954 and to Delta on a DC-8 in 1962. As to the offer made to Delta on the purchase of a DC-8 Mr. Hall testified that no dollar price was even submitted to Delta for the exclusion of the exculpatory clause because "they wanted it for nothing."

As we have pointed out above, the elements of an adhesive contract and of inequality of bargaining are here absent. Nor, although it is true that the manufacture and operation of aircraft is a matter of federal regulation, do we here have the kind of "public interest" to which the above quotation refers. This is evident from the decision in *Stephens* v. *Southern Pacific Co.* (1895) 109 Cal. 86 [41 P. 783, 50 Am. St.Rep. 17, 29 L.R.A. 751], where, in a land lease, the railroad inserted a clause relieving it of liability for any fire started by any of its employees, even if due to their negligence. When the lessee's building was destroyed by a fire started by railroad employees the lessee's insurance company paid for the loss and then sued the railroad. Concerning the fact that the railroad was a regulated carrier the court held (at p. 88) that "The fact that the defendant is a common carrier has no place in the case. . . . At that time it was not dealing with plaintiff Stephens as a common carrier, nor was Stephens contracting with it upon any such understanding or hypothesis. As far as this transaction was concerned, the parties when contracting stood upon common ground, and dealt with each other as A and B might deal with each other with reference to any private business undertaking."

Douglas dealt with Delta in a similar manner. The fact that Delta is a regulated enterprise and carries passengers has no relevance to the present decision. The upholding of the exculpatory clause will not adversely affect rights of future passengers. They are not parties to the contract and their rights would not be compromised. They retain their right to bring a direct action against Douglas for negligence. (*MacPherson* v. *Buick Motor Co.* (1916) 217 N.Y. 382 [111 N.E. 1050, Ann.Cas. 1916C 440, L.R.A. 1916F 696].) Also, their right to bring an action against Douglas for breach of implied warranty would not be interfered with because the passengers were not a party to the contract containing the exculpatory clause.[6]

In short, all that is herein involved is the question of which of two equal bargainers should bear the risk of economic loss if the product sold proved to be defective. Under the contract before us, Delta (or its insurance carrier if any) bears that risk in return for a purchase price acceptable to

[6]See Frumer and Friedman, Products Liability (1964) § 19.07[4]; Harper and James, The Law of Torts (1956) § 28.25, p. 1589: "Disclaimers of warranty or of liability for negligence bind only the parties to the transaction and do not bind third persons."

it; had the clause been removed, the risk would have fallen on Douglas (or its insurance carrier if any), but in return for an increased price deemed adequate by it to compensate for the risk assumed. We can see no reason why Delta, having determined, as a matter of business judgment, that the price fixed justified assuming the risk of loss, should now be allowed to shift the risk so assumed to Douglas, which had neither agreed to assume it nor been compensated for such assumption.[7]

## III

Delta contends that, even if the exculpatory clause is not void because it violates public policy, the clause is void in this case because it attempts to exempt Douglas from liability for an express violation of law. Civil Code section 1668 prohibits such a clause. Delta contends that Douglas failed to comply with certain provisions of the Civil Aviation Act of 1938 (now the Federal Aviation Act of 1958) and that such acts were the proximate cause of the accident. The only understandable argument made under this contention is that, prior to delivery of the aircraft to Delta, certain adjustments were made to the nose wheel assembly by Douglas mechanics. These repairs were inspected by three inspectors who were not certified by the Civil Aviation Administration and Delta contends that such certification was required by title 14, Code of Federal Regulations, section 18.10 et seq. These regulations, promulgated under the authority of the Civil Aviation Act of 1938, provide that only certified personnel may "perform maintenance, repairs or alterations on certified aircraft coming within the applicability of this part. . . ." (Code of Federal Regulations, tit. 14, § 18.10). Section 18.1 of that part contains the following definition of a "certified aircraft": "A certified aircraft is a civil aircraft for which an airworthiness certificate issued by the administrator has not been surrendered or revoked."

---

[7]See note, *Disclaimers of Warranty in Consumer Sales* (1963) 77 Harv.L.Rev. 318, 327: "A thwarting of the policies behind warranty need, not attend recognition of disclaimers in the commercial world. There the buyer may be just as able to absorb and administer the inevitable risks of the seller's operations. . . . There is common recourse to insurance. . . Buyers may even dictate the design, and thus be in a position to prevent the losses to which they are exposed. They are more capable of protecting. themselves by caution and testing, and their own manufacturing processes and quality control systems stand between the object and ultimate users or bystanders."

Clearly there could be no violation of the above regulations unless an airworthy certificate had been issued prior to the adjustments made by Douglas on the nose wheel assembly. The only evidence as to when an airworthiness certificate was issued came from one of Delta's attorneys who asked for a stipulation that such a certificate had been issued to Douglas on November 25, 1957. Delta in its brief admits that it received the aircraft on November 25, 1957, and that the testing performed by Douglas was between November 20 and 23, 1957. Under these facts Douglas could not have violated the above regulations.

The judgment is reversed with directions to enter a judgment in favor of Douglas.

Jefferson, J., concurred.

Files, P. J., being disqualified, did not participate.

A petition for a rehearing was denied December 2, 1965, and respondent's petition for a hearing by the Supreme Court was denied January 6, 1966.