**LYKES BROS. STEAMSHIP CO., INC., Plaintiff,**

v.

**WAUKESHA BEARINGS CORPORATION and Union Carbide Corporation, Defendants.**

No. 76–1349.

United States District Court, E. D. Louisiana.

Nov. 14, 1980.

sha) damages resulting from the failure of a check relief valve in the stern tube seal assembly of its ship the SS ALMERIA LYKES on June 5, 1975, and seeks to recover from the defendants Waukesha and Union Carbide Corporation (Union Carbide) damages resulting from the failure of a ceramic coating on the aft liner of the stern tube seal assembly of the SS ALMERIA LYKES in August 1975.[1] The damages sought for the expense of dry docking, repairing, and loss of use of, the SS ALMERIA LYKES are substantial.

In a counter claim Waukesha seeks indemnification from Lykes for any judgment rendered against it and for attorneys' fees, costs and expenses in defending this action, and in a cross claim seeks indemnification from Union Carbide for any amount for which it may be held liable to Lykes on account of the failed ceramic coating. Union Carbide in a cross claim against Waukesha seeks indemnification for any judgment against it in favor of Lykes.

The trial of these claims was limited to the issue of liability.

### FINDINGS OF FACT

**1.**

Lykes is a Louisiana corporation doing business within this District and is engaged in the ocean shipping business. Lykes is the owner and operator of the SS ALMERIA LYKES, a large barge–carrying ship propelled by a single propeller.

**2.**

Waukesha is a foreign corporation transacting business within this District and State. It manufactured and sold, among other things, a stern tube bearing sealing system for use on large ocean–going vessels. Waukesha was the successful bidder for installing the stern tube bearing sealing

Andrew T. Martinez, New Orleans, La., for plaintiff.

Gerard M. Dillon, New Orleans, La., for defendant Waukesha Bearings Corp.

Robert M. Contois, Jr., New Orleans, La., for defendant Union Carbide.

CASSIBRY, District Judge:

Plaintiff Lykes Bros. Steamship Co., Inc., (Lykes) seeks to recover from the defendant Waukesha Bearings Corporation (Wauke-

---

1. Kepner Products Company, the manufacturer of the check relief valve, was named by plaintiff as an original defendant, and by Waukesha as a third–party defendant. A motion by Kepner for dismissal for lack of personal jurisdiction over it as to the main demand was granted by the late Judge R. Blake West on December 22, 1976, and an identical motion as to the third–party demand was granted by Judge West on February 17, 1977. On September 13, 1977 Judge West recused himself from this case because he had acquired a financial interest in Union Carbide through the succession of his father. The case was then reallotted.

system on the SS ALMERIA LYKES when it was constructed in 1971–72 by General Dynamics, and the installation was approved by Lykes.

3.

Union Carbide is a foreign corporation doing business in this District and State and was engaged, among other things, in the manufacture, application, and sale of ceramic coatings.

4.

The stern tube bearing sealing system is designed to facilitate the transmission of power from the vessel's engines, located internally, to the vessel's propeller, located externally, by keeping seawater out of the vessel at the point where the tail shaft, which connects the engines with the propeller, passes through the hull. The stern tube assembly consists essentially of a forward seal, which operates wholly in an oil environment, and an aft seal, which operates in an environment of oil and water, and contains stern seal liners, both fore and aft. The liners are mounted on, and rotate with, the tail shaft, and rotate against a series of stationary, flexible, rubber–like seal rings to form the seals which serve the dual purpose of keeping lubricating oil inside the assembly and keeping seawater out of the vessel.

5.

The SS ALMERIA LYKES was originally equipped with a Waukesha stern tube assembly that used an uncoated steel liner in the aft seal. This uncoated liner was subject to wear at the point where the rotating liner contacts the seal rings.

6.

During the years before and after the installation of the Waukesha stern tube assembly in the SS ALMERIA LYKES, Waukesha sought to improve the wear–resistant characteristics of its stern tube seal system and thus extend its operational life. Waukesha has conducted research and tests in this area since 1960 to develop and improve its product.

7.

Waukesha obtained early success in improving the wear resistance of the forward seal by, among other things, the application of a ceramic coating on the forward liner. During the period from 1969 through 1972, Waukesha turned its attention to developing a coated aft liner, since it was clear by then that coated liners possessed wear–resistant characteristics superior to uncoated steel liners.

8.

The coatings on coated aft liners put in service by Waukesha and its competitors had failed from unexplained causes. Through its program of testing and analysis, Waukesha determined that the failure of a coating on an aft liner would result from corrosion of the liner's base metal at the interface with the coating, causing separation of the coating from the base metal. Waukesha further determined that the corrosion was caused by seawater that penetrated the coating through microscopic pores and through the coating edge. This mode of failure had not been experienced in the forward seal because the forward liner operates in an environment entirely free of seawater.

9.

Waukesha requested Union Carbide, which had supplied the coating for some of Waukesha's forward liners, to assist in testing designed to permit Waukesha to select a combination of materials that would result in a coated aft liner that would resist the corrosion concluded to be the cause of the earlier failures and still possess the strong wear resistance exhibited by coated forward liners. Union Carbide complied, and developed a ceramic coating essentially impervious to seawater, which prevented seawater from reaching the base material, thus preventing the initiation of the corrosion process. The coating developed was an epoxy sealant, designated as UCAR 100, applied to a chrome oxide coating, designated as LC–4.

### 10.

In February 1974 Waukesha and Union Carbide jointly published a technical report, a copy of which was sent to Lykes, recommending that the aft liners on Waukesha assemblies be replaced with a stainless steel liner coated with a ceramic coating. In the joint report published by Waukesha and Union Carbide, the following representations were made:

> "Waukesha Bearings Corporation and the Coatings Service Department of Union Carbide Corporation have combined their technologies in a successful effort to improve the stern tube bearing sealing system. The product refinement specifically lies in the incorporation of a wear and corrosion resistant coating in the stern tube aft seal liner. The operational life and reliability of the aft seal, as a result, has been increased. For the ship owner, this improved performance translates into longer operation of his vessel between maintenance periods on the stern tube seal systems.

> .    .    .    .    .

> "The 1969 report further advised that Waukesha Bearings would revise its position on the coated aft liner only when broad and intensive testing, both laboratory and shipboard, produced qualitative results in the area of operational advantages with 'no failure' assurances. It is in keeping with that promise that this report is being issued.

> "The Coatings Service Department of Union Carbide Corporation has now developed a materials system which has proven reliable for Waukesha Bearings' aft seal liners. A major component material in that system is UCAR LC–4, Union Carbide's chrome oxide coating. Accordingly, Waukesha Bearings Corporation now recommends their liners with UCAR chrome oxide coating for both the fore and aft stern seals. Waukesha further recommends these liners for use in sea water as well as fresh water operations.

> .    .    .    .    .

> "In the light of the unfortunate experience of others with initial designs of coated aft liners, Waukesha Bearings refrained from adopting this design alternative. Instead, Waukesha elected at that time to conduct its own in–depth investigation of the coating concept before making any changes in the aft liner. It was essential to determine precisely why the coatings were failing on the aft liner while performing very well on the forward liner. This investigation eventually led to the joint project of developing a reliable coated aft liner with the Coatings Service Department of Union Carbide Corporation.

> .    .    .    .    .

> "To produce a reliable coated aft liner, Union Carbide and Waukesha Bearings entered a program of controlled testing and development to:

> (a) Reproduce and define the mode of failure of previously coated aft liners as it may apply to Union Carbide's chrome oxide coating and

> (b) Correct the design in order to prevent reoccurrences of the failure.

> "Based upon information acquired earlier on previous attempts with coated aft liners, the materials composite was duplicated and the environment simulated under laboratory control . . . ."

> .    .    .    .    .

> " . . . . Exhaustive testing in accelerated simulation of the operational environment revealed more than one of these trial designs and material composites to be seaworthy. The design providing the greatest margin of safety against sea water corrosion and the greatest resistance to wear, however, was recommended by Union Carbide and accepted by Waukesha Bearings."

### 11.

On May 30, 1974 Lykes placed an oral order with Waukesha for a coated liner for the aft seal of the SS ALMERIA LYKES.

### 12.

On September 5, 1974 Union Carbide submitted its quotation to Waukesha for coating various sized aft liners with LC–4 ceramic coating and sealing the coating with UCAR 100 sealant. The quotation was made by Union Carbide subject to certain terms and conditions, including the following:

7. Seller warrants that at the time of shipment each article will meet Seller's applicable standard specifications for such article or service in effect at that time or such other specifications as have been expressly agreed upon with Buyer in a writing signed by one of Seller's Officers or Marketing Managers. THERE ARE NO EXPRESS WARRANTIES BY SELLER OTHER THAN THOSE SPECIFIED IN THIS PARAGRAPH 7. NO WARRANTIES BY SELLER (OTHER THAN WARRANTY OF TITLE AS PROVIDED IN THE UNIFORM COMMERCIAL CODE) SHALL BE IMPLIED OR OTHERWISE CREATED UNDER THE UNIFORM COMMERCIAL CODE, INCLUDING BUT NOT LIMITED TO WARRANTY OF MERCHANTABILITY IN OTHER RESPECTS THAN SPECIFIED IN THIS PARAGRAPH 7 AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. Without limiting the generality of the foregoing, Buyer assumes all risk and liability for the results obtained by the use of any articles processed or manufactured hereunder in any manufacturing processes or in combination with any other substances or articles.

### 13.

Waukesha placed an order with Union Carbide for the coating of the aft liner. In response to Waukesha's order, Union Carbide issued its invoice therefor, sending Waukesha the acknowledgment copy which contained, inter alia, the following terms and conditions on the reverse side:

5. Seller warrants that at the time of shipment each article will meet Seller's applicable standard specifications for such article or service in effect at that time or such other specifications as have been expressly agreed upon with Buyer in a writing signed by one of Seller's Officers or Marketing Managers. THERE ARE NO EXPRESS WARRANTIES BY SELLER OTHER THAN THOSE SPECIFIED IN THIS PARAGRAPH 5. NO WARRANTIES BY SELLER (OTHER THAN WARRANTY OF TITLE AS PROVIDED IN THE UNIFORM COMMERCIAL CODE) SHALL BE IMPLIED OR OTHERWISE CREATED UNDER THE UNIFORM COMMERCIAL CODE, INCLUDING BUT NOT LIMITED TO WARRANTY OF MERCHANTABILITY IN OTHER RESPECTS THAN SPECIFIED IN THIS PARAGRAPH 5 AND WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE. Without limiting the generality of the foregoing, Buyer assumes all risk and liability for the results obtained by the use of any articles processed or manufactured hereunder in any manufacturing processes or in combination with any substances or articles.

### 14.

Union Carbide coated and sealed the liner forwarded to it by Waukesha, and returned the liner to Waukesha. The coating was found to contain a pit and was returned to Union Carbide for correction. Union Carbide removed the pit by buffing and returned the liner to Waukesha.

### 15.

Near the time for a scheduled drydocking of the SS ALMERIA LYKES, Waukesha recommended to Lykes in April 1975 that an improvement to its originally installed stern tube assembly could be made by a modification to the assembly whereby a relief–check valve would be installed in the assembly to provide additional oil to the guide ring cavity forward of the aftermost seals in the aft seal to maintain a pressure within the assembly, whereas the pressure had been static, and thus reduce the outside pressure against the aft seals. The reduced pressure would reduce the friction at the

point where the rubber–like seals made contact with the liner, and increase the life of the seals. After consideration of this recommendation, Lykes ordered by telephone the valve modification to be installed on the SS ALMERIA LYKES during her drydocking at Newport News Shipyard on May 7–12, 1975, and engaged the services of Waukesha, by a service engineer, to supervise installation. The valve modification and the coated liner were installed by employees of Newport News Shipyard in May 1975 under the direct supervision of a Waukesha field engineer.

### 16.

Waukesha forwarded to Lykes acknowledgments of the orders for the relief–check valve and the coated liner. As to the valve Waukesha acknowledged an order for "Set of Waukesha Relief–check valve parts consisting of: 1–Kep–O–Seal Relief Check Valve 1–Filter 1–Snap Ring" at a price of $75.00. As to the coated liner Waukesha acknowledged an order for "Aft liner with ceramic coating" at a price of $6,855.00, plus shipping charges. In bold face print at the bottom of the customer's acknowledgment copy of the invoice appears the following admonition: "SUBJECT TO ADDITIONAL TERMS AND CONDITIONS OF SALE APPEARING ON THE REVERSE SIDE. SELLER MAKES NO WARRANTIES OTHER THAN THAT STATED ON THE REVERSE SIDE." Paragraphs 9 and 12 on the reverse side read as follows:

9. Warranty. Seller warrants its products to be free from defects in materials and workmanship for a period of ninety (90) days from date of shipment by Seller (except that in the case of stern tube bearings and seals and line shaft bearings for marine applications, the warranty period shall extend for one (1) year after installation but no more than two (2) years after shipment). If within such period any such product shall be proved to Seller's satisfaction to be so defective, such products shall be repaired or replaced at Seller's option. Seller's obligation upon such warranty shall be limited to such repair or replacement and shall be conditioned upon Seller's receiving written notice of any alleged defect within 10 days after its discovery and, at Seller's option, return of such products or parts to Seller, f.o.b. its factory. Seller assumes no liability whatsoever for expenses of removing any defective product or part or for installing the repaired product or part or a replacement therefor or for any loss or damage to equipment in connection with which Seller's products or parts shall be used.

This warranty shall not apply to products or parts not manufactured by Seller or to products or parts which shall have been repaired or altered by others than Seller so as, in its judgment, adversely to affect the same, or which shall have been subject to negligence, accident, damage by circumstances beyond Seller's control, or improper operation, maintenance or storage, or to other than normal use or service. With respect to products and parts not manufactured by Seller, the warranty obligations of Seller shall in all respects conform and be limited to the warranty actually extended to Seller by its supplier.

THE FOREGOING WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL OTHER EXPRESS AND IMPLIED WARRANTIES (EXCEPT OF TITLE), INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. Seller shall not be subject to any other obligations or liabilities whatsoever, with respect to products manufactured or furnished by it, or any undertakings, acts or omissions relating thereto.

.         .         .         .         .

12. Consequential Damages, Indemnity. Anything to the contrary contained herein notwithstanding, SELLER SHALL NOT BE LIABLE FOR ANY CONSEQUENTIAL, CONTINGENT OR INCIDENTAL DAMAGES WHATSOEVER.

Purchaser shall indemnify Seller against any and all losses, damages and

expenses (including attorneys' fees and other costs of defending any action) that it may sustain or incur as a result of any claim of negligence, breach of implied warranty to [sic] strict liability in tort by purchaser, its successors and assigns and its customers whether direct or indirect, in connection with the use or products furnished hereunder, including, without limitation, such as may be caused by the negligence of Seller, its officers and employees.

### 17.

Lykes received the acknowledgment of the order for the coated liner. It has no record for receipt of the acknowledgment of the order for the valve. The same terms and conditions were included in similar acknowledgments for at least nine sales made by Waukesha to Lykes during the period from March 6, 1974 to May 1, 1975. Lykes representative Joseph Bernstein, Jr., Vice President of Lykes Maintenance and Repair Division, had never read the terms and conditions on any of the acknowledgments. He had never discussed with Waukesha the extent of its warranty because Lykes had never before the orders for the valve and coated liner had any trouble with Waukesha's equipment.

### 18.

The SS ALMERIA LYKES resumed operations after its May drydocking at 1800 hours on June 4, 1975. At 0900 hours on June 5 an alarm sounded which revealed that the oil supply for the stern tube bearing sealing system had been so greatly diminished that the lubrication of the system was in jeopardy. The crew determined that it was necessary for the ship to return to the Newport News drydock for examination to determine the cause.

### 19.

The vessel returned to Newport News and, after a lay period awaiting availability of a drydock, was drydocked on June 16, 1975. The stern tube bearing sealing system was removed from the vessel, disassembled, and inspected. Inspection and testing of the valve by representatives of Lykes and Waukesha revealed that it was erratic in operation and defective. The failure of the valve to operate properly had allowed the pressure in the oil chamber to become greater than the seawater pressure outside the chamber and oil flowed through the seals into the sea.

### 20.

The valve was not manufactured by Waukesha, but was in fact manufactured by Kepner Products Company and purchased by Waukesha from Neff Engineering Company. Waukesha had ordered 15 of these valves from Neff Engineering Company in November 1974 at a list price of $25.25 each, and had ordered 10 in January 1975 at the same price. Both orders were scheduled for delivery in February 1975. The defective valve was probably one from these orders. In its invoice to Waukesha, Neff Engineering Company limited its liability as follows:

> We limit our liability to the value of the defective material only. We assume no liability for damage to person or property caused by merchandise brought [sic] from or through us. We are not liable for loss or damage caused by contingencies beyond our control which may cause delay in delivery. All specifications and engineering information are taken from the manufacturer's literature, and are subject to error, and to change without notice.

### 21.

Waukesha had not tested the valve prior to its installation in the SS ALMERIA LYKES. It had tested others of the same design and they performed well. Because the valves are standard commercial items, it is not Waukesha's policy to test each valve. Other of these valves which Waukesha had placed in service had performed without malfunction.

### 22.

After the testing and inspection of the valve, the changes required to accommodate the valve were removed and the stern tube assembly was returned more or less to its condition prior to the valve modification,

except that the assembly continued to contain the coated liner installed during the May drydocking.

23.

On June 24, 1975 the vessel returned to service.

24.

On August 2, 1975 the personnel on the vessel discovered that the oil supply system for the stern tube bearing sealing system had lost 33 gallons during a trip from Galveston, Texas to New Orleans, Louisiana, and the loss of oil continued on a steady basis until the ship was drydocked at Newport News, Virginia on August 29, 1975.

25.

The stern tube assembly was again removed from the vessel and opened for inspection under the supervision of a representative of Waukesha with representatives of Lykes in attendance.

26.

The inspection revealed that the ceramic coating on the aft liner was damaged. In the areas of contact with the seal rings the coating was chipped and pieces of it were missing. The seal rings were damaged also at the point of contact with the liner. The damage had caused the seal to become inadequate so that oil leaked from the vessel through the stern tube.

27.

Waukesha formed the opinion at the time of the failure that it was caused by very high localized temperatures at the point of contact of the seals with the liner. Without making calculations, Waukesha engineers concluded that the stainless steel base material of the liner had a different coefficient of expansion to the ceramic coating material; that the stainless steel base expanded more rapidly than the ceramic coating, producing stress that caused the ceramic coating to fracture and destroy the efficiency of the seal.

28.

At a meeting on September 5, 1975 Waukesha and Union Carbide representatives discussed the cause of the failure of the ceramic coating on its aft liner in the SS ALMERIA LYKES and in other vessels. Calculations were made which indicated that a 280° F. temperature rise would cause the coating to crack because the expansion of the steel at that temperature would force a rupture in the coating. It was theorized that a 280° rise was possible in the aft liner. Waukesha conducted tests after this meeting which confirmed this theory as the cause of the failure in the SS ALMERIA LYKES and two other vessels. The heat–related failures on the other vessels were not known by Waukesha before the installation of the coated aft liner on the SS ALMERIA LYKES.

29.

The erroneous assumption by Waukesha that excessive heat would not be experienced within the aft seal allowed the condition in the aft seal which produced the heat–related damage. Waukesha engineers were aware that excessive heat would cause deterioration of the seals. Excessive heat had been a problem which Waukesha had overcome in its forward seals, but Waukesha concluded that the aft seal's exposure to water would allow it to operate at a lower temperature than the forward seal. Waukesha regarded the sea as an "excellent heat sink" which would eliminate heat as a problem in the aft seal. Waukesha failed to realize that a large diameter liner such as the aft liner of the SS ALMERIA LYKES would have an increased circumferential speed over the smaller liners it used in its tests, which would generate more friction heat at the contact area of the seals with the liner than could be dissipated by the seawater.

30.

Waukesha did not test in a water environment its assumption that heat would not be a problem in aft liners. Using a test rig at its plant, it had conducted extensive testing of various seal rings, coatings and base metal. These tests had involved oil–cooled seals on small–diameter shafts. Waukesha never tested a large–diameter coated liner in a water environment for temperature problems. No tests were made to measure

the heat that would be generated at the points where the rubber seal rings contact the coated liner.

31.

Waukesha led Union Carbide to believe that heat was not a problem to be overcome in the aft seal. Waukesha and Union Carbide concluded that the temperature that would be experienced in aft seals would not exceed the temperature that had been experienced in the forward seals where LC–4 coatings had been in use for several years without any evidence of heat–related damage.

32.

Waukesha represented to Union Carbide that the problem to be overcome as to coated liners in the aft seal was the problem of corrosion of the liner caused by seawater. It approached Union Carbide for assistance in developing a coating which would resist this corrosion. Union Carbide's efforts in developing the coated liner addressed only the corrosion problem.

## THE ISSUES

Lykes contends that Waukesha is liable to it for the consequential damages incurred upon failure of the check relief valve under the doctrine of strict liability because the valve was defective at the time of installation, and not fit for its intended use, and because Waukesha was negligent in failing to test the valve before installation. Lykes contends that Waukesha and Union Carbide are liable for the consequential damages incurred upon failure of the coated liner in the aft seal assembly under the doctrine of strict liability and for negligence in failing to properly design, manufacture and test the coated liner before sale, and because of material misrepresentations contained in the joint report of Waukesha and Union Carbide on the reliability of coated liners.

Waukesha disclaims liability for the consequential damages incurred by Lykes, relying on the clauses in its invoices for the valve and the coated liner limiting its liability. It denies that it was negligent in the installation of the valve or the manufacture

of the coated liner, and denies that the doctrine of strict liability has any application as to the valve failure because it was not the manufacturer of the valve.

Union Carbide contends that its service was in full compliance with the warranty it extended to Waukesha, that its product was not defective or unreasonably dangerous and that it was not negligent.

## CONCLUSIONS OF LAW

1.

The Court has jurisdiction under its admiralty and maritime jurisdiction, 28 U.S.C. § 1333, and under its diversity jurisdiction, 28 U.S.C. § 1332.

2.

■ The provisions of the limitation of liability clauses in the Waukesha invoices to Lykes effectively limit Waukesha's liability for consequential damages under any theory of warranty, strict liability or negligence.

3.

■ Sellers of chattels may validly limit their liability, or disclaim liability altogether, for damages resulting from negligent design or manufacture of their products. *Jig The Third Corporation v. Puritan Marine Insurance Underwriters Corporation*, 519 F.2d 171 (5th Cir. 1975). For reasons of public policy, the protection afforded by disclaimer clauses extends only to ordinary negligence, but not to gross negligence, that is, conduct falling greatly below the standard established by law for the protection of others against unreasonable risk of harm. *Todd Shipyards Corp. v. Turbine Services, Inc.*, 467 F.Supp. 1257; Restatement of Contracts § 574 (1932).

4.

[4] The failure of Lykes to read the limitation clauses in the Waukesha invoices does not avoid their binding effect between the parties under the circumstances. In a course of dealing during the period from January 6, 1972 to May 1, 1975, Lykes had approved for payment similar invoices with

the identical limitation clause for at least nine sales made by Waukesha to Lykes. Lykes is bound under these circumstances in the same way that one who signs a contract is bound by contractual provisions which he could have read but failed to do so. *Commercial Contractors, Inc. v. U. S. Fidelity and Guaranty Company*, 524 F.2d 944 (5th Cir. 1975); *Hicks v. Ocean Drilling and Exploration Company*, 512 F.2d 817 (5th Cir. 1975); see *Hudson Waterways Corporation v. Coastal Marine Service, Inc.*, 436 F.Supp. 597 (E.D.Tex.1977).

### 5.

■ The contention of Lykes is not sustained that the limitation clauses are not enforceable because the parties were not of relatively equal bargaining power because Lykes had no alternative but to deal with Waukesha with respect to repair, modification, parts and supervision for the Waukesha equipment. Lykes is a financial giant compared to Waukesha. There is no proof that Waukesha was in a position for any reason to drive a hard bargain with Lykes. Lykes did business with Waukesha because it had found it to be a reliable company.

### 6.

■ Waukesha had a duty to test the check relief valve installed in the aft seal assembly of the SS ALMERIA LYKES, and its breach of that duty was negligence. Waukesha was more than the good faith seller of a chattel manufactured by a third person who has no duty to test or inspect

under Restatement of Torts (2nd) § 402.[2] It recommended that the relief check valve be added as a modification of its manufactured product—the aft seal assembly, and its service representative was on hand to supervise the installation according to Waukesha's drawing. It had the same duty to inspect and test the valve that it would have had if the valve had been installed in the original manufacture of the assembly under Restatement of Torts (2nd) § 395.[3] Illustration 2 of § 395 [4] makes clear that a manufacturer who incorporates in its product parts manufactured by another has a duty to test and inspect those parts which can cause an unreasonable risk of harm if they are defective.

### 7.

A more difficult question is whether or not Waukesha's breach of the duty to test the valve constituted gross negligence which would make it responsible for the consequential damages resulting from the failure of the valve, notwithstanding the limitation of liability clauses. Mitigating against a finding of gross negligence is the evidence that these valves were standard commercial items which Waukesha purchased in quantity from a reputable manufacturer, and those which had been tested and placed in service by Waukesha performed well. On the other hand, the magnitude of the foreseeable damage in this instance if this particular valve was defective—loss of excessive amounts of the ship's lubricating oil with possible bearing dam-

---

**2.** A seller of a chattel manufactured by a third person, who neither knows nor has reason to know that it is, or is likely to be, dangerous, is not liable in an action for negligence for harm caused by the dangerous character or condition of the chattel because of his failure to discover the danger by an inspection or test of the chattel before selling it.

**3.** A manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing physical harm to those who use it for a purpose for which the manufacturer should expect it to be used and to those whom he should expect to be endangered by its probable use, is subject to liability for physical harm caused to them by its

lawful use in a manner and for a purpose for which it is supplied.

**4.** The A Motor Company incorporates in its car wheels manufactured by the B Wheel Company. These wheels are constructed of defective material, as an inspection made by the A Company before putting them on its car would disclose. The car is sold to C through the D Company, an independent distributor. While C is driving the car the defective wheel collapses and the car swerves and collides with that of E, causing harm to C and E, and also to F and G, who are guests in the cars of C and E respectively. The A Motor Company is subject to liability to C, E, F, and G.

age and pollution law violation, removal of the vessel from service, the expenses of necessary drydocking to find and correct the damage, and related expenses thereto—compels a finding of gross negligence for failure to test and inspect it. The foreseeable risk of serious harm resulting from failure of a valve may not be present in each use of these valves by Waukesha, but in the case of its use in the SS ALMERIA LYKES, Waukesha was aware of the serious consequences of failure. Its breach of the duty to test the valve was gross negligence.

8.

■ Waukesha was not negligent in its design, manufacture and testing of the coated liner for the aft seal assembly of the SS ALMERIA LYKES. Waukesha knew that heat was an enemy of seal assemblies. It could readily have determined from textbook information the coefficients of expansion of the steel used for the liner and the LC4 coating. The reason that no tests were made which would have revealed that heat would be a problem with a coated liner in the aft seal of the SS ALMERIA LYKES was the belief and assumption of Waukesha that the operation of the aft seal in cold salt water eliminated any possibility of heat problems. This assumption was a failure of expertise–engineering error by the Waukesha engineers.

The evidence does not sustain Lykes' contention that it was unreasonable for Waukesha, in the light of its knowledge and experience, to assume that there would be no heat problems with aft seal liners. Furthermore, the evidence does not permit the conclusion that the Waukesha engineers should have known that their assumption was subject to question, and should have been tested.

Coated liners had been used in Waukesha's forward seals for several years. The experience had been good. No cracking had occurred due to temperature rises. The forward seals were known to run hotter than aft seals because testing of the seal rings showed that those in the forward seals wore out faster than those in the aft

seals. In addition the coated aft liner was expected to generate less friction with the seal rings than the uncoated liner, and thus less heat. The conclusion that the aft seal generally operates at a cooler temperature than the forward seal was not disproved. The tests after the failure showed that unforeseen localized temperature rise at the point of contact of the seals with the coated liner had been caused by the high circumferential speed of the large diameter liner of the SS ALMERIA LYKES. From the evidence I cannot conclude that Waukesha should have foreseen the probability of this condition.

9.

■ The failure of the aft seal coated liner was not caused by any defect in the manufacture of the coating, or by any negligence of Union Carbide as manufacturer of the coating. The failure was caused by the erroneous assumption by Waukesha that temperature levels would not be experienced within the aft seal that could produce heat related failure. Waukesha was the expert in the field of design, manufacture and service of stern tube assemblies. Union Carbide reasonably accepted the assumption of Waukesha that heat would be no problem in the aft seal. In the words of the Union Carbide Engineers, it "never crossed their minds" that heat would be generated in the salt water environment in which the aft seal operated which would not be dissipated by the salt water.

Union Carbide manufactures coatings to meet its customers needs and specification, and is an expert in its field. Waukesha approached Union Carbide to manufacture a coating for aft liners that would be corrosion resistant in salt water. Union Carbide's efforts were directed toward this result. Lykes argument that Union Carbide knew or should have known that heat was a potential problem in aft seals using coated liners and should have made Waukesha aware of it so that appropriate testing could be done is not supported by the evidence. Even though engineers at Union Carbide may have known that the difference in thermal expansion between stainless

steel and LC4 coating could lead to cracking of the coating in situations involving heat, the fact is that Union Carbide did not know that the operation of the aft seal would present a situation involving heat.

An in–house memorandum of Union Carbide which indicated that the several base materials submitted by Waukesha would have their thermal characteristics reviewed is not proof that Union Carbide knew potential heat problems existed in the operation of the aft seal. The writer of the memorandum explained that this review was to be done to avoid thermal expansion problems upon curing of any sealant applied over LC4 at high temperature. A sealant that could be cured at room temperature was selected so that the review of the thermal expansion characteristics never become necessary. The review was never contemplated to avoid heat problems in the operation of the coated liner.

The fact that Union Carbide knew that thermal shock had produced failure of ceramic coating in an automobile water pump cannot be translated to knowledge that thermal shock would be experienced in the aft seal of a shipping vessel. Since Union Carbide did not know that thermal shock could be a problem in the seal, it was not negligent in failing to recommend a coating more resistant to thermal shock than LC4.

### 10.

■ Waukesha and Union Carbide are not liable for the consequential damages caused by the failure of the aft liner under a theory of misrepresentation. A joint report prepared by Waukesha and Union Carbide entitled "Wear Resistant Coated Lin-

ers in Stern Tube Sealing Systems" was published in February 1974. Its principal message was that the corrosion problem in coated aft liners had been overcome, but it contained statements relative to reliability of the liner, upon which Lykes contends it relied in purchasing the liner, which admittedly could not be substantiated after the failure.

Lykes' reliance on Restatement of Torts (2nd) § 402 B [5] for recovery on the theory of innocent misrepresentation is misplaced. This section relates to physical harm to a consumer caused by innocent misrepresentation as distinguished from pecuniary loss caused thereby. The Reporter's Notes under Comment (a) of this section show that the applicable rule in the case of pecuniary loss resulting from innocent misrepresentation is found in § 552 C.[6] Subsection (2) of that section limits damages in the case of innocent misrepresentation to those that are restitutionary in nature. The Reporter's comments in (f) make clear that, if the defendant's misrepresentation is an innocent one he is not liable for consequential damages.

Sections 470, 479 and 481 of the Restatement of Contracts, relied on by Lykes speaks only to avoidance of contracts on account of misrepresentation and are not authority for awarding consequential damages when one of the parties to a contract has made an innocent misrepresentation to induce the other to enter into the contract.

### 11.

Lykes is entitled to judgment against Waukesha for the amount of its provable consequential damages incurred with re-

---

**5.** One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a misrepresentation of a material fact concerning the character or quality of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the representation, even though

    (a) it is not made fraudulently or negligently, and

    (b) the consumer has not bought the chattel from or entered into any contractual relation with the seller.

**6.** (1) One who, in a sale, rental or exchange transaction with another, makes a misrepresentation of a material fact for the purpose of inducing the other to act or to refrain from acting in reliance upon it, is subject to liability to the other for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation, even though it is not made fraudulently or negligently.

(2) Damages recoverable under the rule stated in this section are limited to the difference between the value of what the other has parted with and the value of what he has received in the transaction.

spect to the defective valve installed on the SS ALMERIA LYKES. Its claim for the damages resulting from the failure of the coated liner, the counterclaim of Waukesha against Lykes, and the cross claims of Waukesha and Union Carbide against each other are dismissed.

The clerk shall prepare judgment accordingly.