**ARCWEL MARINE, INC., Third-party Plaintiff/Appellee/Cross-Appellant,**

v.

**SOUTHWEST MARINE, INC., Third-party Defendant/Appellant/Cross-Appellee,**

**and**

**San Diego Unified Port District, Third-party Defendant/Cross-Appellee.**

Nos. 86–5882, 86–5889.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 4, 1987.

Decided May 1, 1987.

Peter J. Ippolito, San Diego, Cal., for third-party plaintiff/appellee/cross-appellant.

C. Douglas Alford, San Diego, Cal., for third-party defendant/appellant/cross-appellee.

Before TANG, ALARCON and KOZINSKI, Circuit Judges.

KOZINSKI, Circuit Judge: ·

We consider whether an exculpatory clause in a contract for use of a dry dock, itself an integral part of a Navy procurement contract package, was unenforceable on grounds of unconscionability.

## Facts

Arcwel Corporation ("Arcwel") was awarded a contract by the United States Navy to overhaul the U.S.S. Dubuque. The contract required that the overhaul be performed at a Navy-owned dry dock that was under lease to the San Diego Unified Port District ("Port District"). The dry dock lease obligated the Port District to maintain the leased property and "keep it in good working order and operating condition so as to assure full availability and usefulness at all times." The Port District in turn entered into a contract with Southwest Marine, Inc. ("Southwest") for the maintenance and repair of the dry dock facility.

Pursuant to its contract with the Navy, Arcwel signed a User's Agreement with the Port District. The User's Agreement provided that Arcwel would indemnify and hold harmless the Port District and Southwest for any losses arising out of the docking or undocking of any vessel. The User's Agreement also incorporates a dry dock tariff, which contains a clause exculpating the Port District and Southwest for any loss arising from disruption, delay or negligence, "so long as [the] parties have acted in good faith." The tariff also provides that the dry dock is made available on an "as is, where is" basis, "without warranty of any kind either express or implied."

The dry dock was equipped with two gantry cranes, the Wellman and the Myerstein. The lease listed one of these cranes as included in the leased property; a map attached to the lease showed both cranes; and the Tariff provided that the Myerstein and, at certain times, the Wellman were available for use.

Unfortunately, when Arcwel got down to the business of performing the overhaul it discovered that neither crane could be used effectively. The U.S.S. Dubuque was docked October 5, 1982. The Wellman did not become available until October 12 and even then did not function properly. The

Myerstein was finally made available November 6. In the meantime, Arcwel had to rent land-based cranes as substitutes. Land-based cranes are less efficient than gantry cranes, adding to Arcwel's labor costs. The unavailability of the gantry cranes also adversely affected the work of Sipco Marine, Inc. (Sipco), the subcontractor hired to do sandblasting work on the U.S.S. Dubuque.

### Proceedings Below

Sipco sued Arcwel for amounts allegedly owed under the sandblasting subcontract. As part of that suit Sipco claimed that the unavailability of the gantry cranes caused inefficiencies, slowdowns and extra cost for the subcontracted work. Arcwel filed a third-party complaint against the Port District and Southwest alleging negligence, breach of contract under a third-party beneficiary theory, and indemnity, all based on allegations that the gantry cranes were improperly repaired and maintained. The district court granted the Port District's motion for summary judgment as to all claims. In addition, the district court granted Southwest's summary judgment motion as to the third-party beneficiary and indemnity counts, leaving only the negligence claim pending.

The parties proceeded to trial before a magistrate. The magistrate entered final judgment after trial in favor of Arcwel for $464,705.48 plus costs for the negligent failure to maintain the gantry cranes. He refused to give effect to the exculpatory clause in the User's Agreement on grounds of unconscionability.

Southwest appeals the magistrate's decision; Arcwel cross-appeals from the district court's summary judgment orders.

### Discussion

Southwest challenges the magistrate's ruling that the exculpatory clause was unconscionable and therefore unenforceable under California law. The magistrate based that conclusion on his finding that Southwest and the Port District were in a superior bargaining position and that Arcwel had no choice but to perform the work on the dry dock offered. Southwest argues that the magistrate should have applied maritime law, not California law, in interpreting the contract. Southwest also claims that, whichever law applies, the clause should be enforced. The magistrate's factual findings are reviewed under the clearly erroneous standard, while his conclusion that the clause was unconscionable raises a question of law subject to de novo review. *See Co-efficient Energy Systems v. CSL Industries, Inc.*, 812 F.2d 556, 557 (9th Cir.1987). The choice of law determination is also reviewed de novo. *Phillips v. Amoco Trinidad Oil Co.*, 632 F.2d 82, 84 (9th Cir.1980), *cert. denied*, 451 U.S. 920, 101 S.Ct. 1999, 68 L.Ed.2d 312 (1981).

The choice of governing law in this case presents a close question. The contract between the Navy and Arcwel is one for the repair of a vessel, traditionally subject to maritime law. *See Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961). On the other hand, the exculpatory clause is part of the User's Agreement between Arcwel and the Port District, a contract for the use of a dry dock. There is a split of authority as to whether maritime law applies to such contracts. *See, e.g., Royal Ins. Co. of America v. Pier 39, Ltd.*, 738 F.2d 1035, 1037–38 (9th Cir.1984) (insurance policy on dry dock not within admiralty jurisdiction, citing cases on maintenance of docks).[1] Happily, we need not resolve this difficult issue because we reach the same conclusion under either body of law.

### 1. California law

■ California courts have generally upheld exculpatory provisions so long as they do not "affect the public interest." *Tunkl v. Regents of the Univ. of Cal.*, 60 Cal.2d 92, 96, 32 Cal.Rptr. 33, 383 P.2d 441 (1963). However, California courts have empha-

---

**1.** We note that exercise of admiralty jurisdiction and the application of maritime law are not necessarily coextensive. The court may exercise diversity jurisdiction, as it did in this case, and still apply principles of maritime law. *See, e.g., Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959).

sized that the public interest exception should not be applied to invalidate exculpatory clauses entered into between commercial entities of equal bargaining power. There is "no reason" why one party, "having determined, as a matter of business judgment, that the price fixed justified assuming the risk of loss, should now be allowed to shift the risk so assumed to [the other party], which had neither agreed to assume it nor been compensated for such assumption." *Delta Air Lines, Inc. v. Douglas Aircraft Co.*, 238 Cal.App.2d 95, 47 Cal.Rptr. 518, 524 (1965); *see also Philippine Airlines, Inc. v. McDonnell Douglas Corp.*, 189 Cal.App.3d 234, 234 Cal. Rptr. 423 (1st Dist.Cal.App.1987).

The commercial context presented by this case raises equities far different from those of the helpless patient entering the hospital in *Tunkl*. Arcwel admits that, when it submitted its bid to the Navy, it was aware that it would be have to sign the User's Agreement and was familiar with the terms. Therefore, it had an opportunity to make its bargain based on the entire package offered by the Navy, including the allocation of various risks associated with the project. If the package as a whole was unacceptable, Arcwel could have declined to bid. Or, it could have increased its bid price to take into account the risk imposed by the exculpatory clause. We find the public interest not seriously implicated by this provision.[2]

### 2. Maritime law

 If we analyze the contract under maritime law, the exculpatory clause stands on even stronger footing. Clear precedent holds that, "absent evidence of overreaching, clauses limiting liability in ship repair contracts will be enforced." *M/V American Queen v. San Diego Marine Const. Corp.*, 708 F.2d 1483, 1488 (9th Cir.1983); *see also Morton v. Zidell Explo-*

*rations, Inc.*, 695 F.2d 347, 350 (9th Cir. 1982), *cert. denied*, 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983). We find no evidence of overreaching here.

### Conclusion

Whichever law applies, the clause shifting the risk of loss due to negligent maintenance to Arcwel is enforceable, shielding both Arcwel and Southwest from liability. Given the validity of the exculpatory clause, the district court's orders granting summary judgment to Southwest and the Port District were correct.

The magistrate's judgment against Southwest Marine (No. 86–5882) is REVERSED; the district court's summary judgment orders appealed by Arcwel Corp. (No. 86–5889) are AFFIRMED.

---

uments. To allow the successful bidder to change a key term retroactively would be unfair to the other bidders; such post-hoc renegotiation of the contract's terms could also seriously undermine the government's procurement process.