AGIP PETROLEUM CO., INC., Plaintiff,

v.

GULF ISLAND FABRICATION, INC., et al., Defendants.

Civil Action No. H–94–3382.

United States District Court, S.D. Texas, Houston Division.

March 25, 1996.

J. Harrell Feldt, Vinson & Elkins, Houston, Texas, for Plaintiff.

James M. Tompkins, Galloway, Johnson, Tompkins & Burr, Houston, Texas, for Gulf Island Fabrication.

Innes MacKillop, Brown, Sims, Wise & White, Houston, Texas, for McDermott.

Steven L. Roberts, Fulbright & Laworski, Houston, Texas, for Snamprogetti.

Michael P. Morris, Tekell, Book, Matthews & Limmer, L.L.P., Houston, Texas, for Petro–Marine.

## ORDER ON SUMMARY JUDGMENT

HUGHES, District Judge.

1. The court adopts the memorandum and recommendation of the United States Magistrate Judge signed February 15, 1996.

2. Gulf Island Fabrication, Snamprogetti USA, McDermott Incorporated, and Petro–Marine Engineering of Texas are granted summary judgment on AGIP Petroleum's tort claims for economic losses.

3. Gulf Island Fabrication, Snamprogetti USA, McDermott Incorporated, and Petro–Marine Engineering of Texas are granted summary judgment on AGIP Petroleum's claims for special, punitive, direct, or consequential damages under negligence and strict liability theories.

4. McDermott, Inc. is granted summary judgment on AGIP Petroleum's claims for special, punitive, direct, or consequential damages under contract and breach of warranty theories.

5. Gulf Island Fabrication, Snamprogetti USA, and Petro–Marine Engineering of Texas are granted summary judgment on AGIP Petroleum's claims for special, punitive, direct, or consequential damages under contract and breach of warranty theories not premised on a willful or deliberate disregard of a contractual duty.

6. Gulf Island Fabrication, Snamprogetti USA, McDermott Incorporated, and Petro–Marine Engineering of Texas are denied summary judgment on AGIP Petroleum's claims for actual compensatory damages other than economic losses based on gross negligence or willful misconduct.

7. Gulf Island Fabrication, Snamprogetti USA, and Petro–Marine Engineering of Texas are denied summary judgment on AGIP Petroleum's contract and breach of warranty claims based on a willful or deliberate disregard of a contractual duty.

8. Gulf Island Fabrication, Snamprogetti USA, McDermott Incorporated, and Petro–Marine Engineering of Texas are denied summary judgment on AGIP Petroleum's claims for breach of contract and breach of warranty for direct damages not contractually excluded.

## MEMORANDUM AND RECOMMENDATION

CRONE, United States Magistrate Judge.

Pending before the court are the motions for summary judgment of Defendants McDermott Incorporated (McDermott) (# 30), Snamprogetti USA, Inc. (Snamprogetti) (# 51), Gulf Island Fabrication, Inc. (Gulf Island) (# 53), and Petro–Marine Engineering of Texas, Inc. (Petro–Marine) (# 81). Having reviewed the motions, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the defendants' motions for summary judgment should be granted in part and denied in part.

1. *Background*

Each of the defendants was involved in the design, manufacture, transportation, or installation of a four pile, sixteen slot drilling/production platform jacket for AGIP to be installed in Grand Isle Block 102 of the Gulf of Mexico located offshore Louisiana. On June 18, 1992, AGIP contracted with Snamprogetti to supervise the design and fabrication of the jacket. Snamprogetti, in turn, hired Petro–Marine to provide design and engineering services. On November 18,

1992, AGIP contracted with McDermott for the transportation and installation of the jacket. On May 5, 1993, AGIP and Gulf Island entered into an agreement for the fabrication of the jacket.

On October 17, 1993, the completed jacket was loaded on a transportation barge and shipped offshore from Houma, Louisiana. It was transported successfully to the installation site and offloaded from the barge. The jacket's mud mats, however, were breaking loose from the structure. Repairs were done in the water, and the jacket was upended into a vertical position for landing. There were still problems with the mud mats, which eventually were removed by divers. The jacket was placed in the desired location on the ocean bed without the mud mats. During pile-driving operations, the jacket sank and toppled over on its side in water 257 feet deep. The jacket was salvaged and towed to shore for inspection and repairs. It was reinstalled successfully on January 27, 1994.

AGIP incurred damages and costs exceeding $15,000,000.00. AGIP's Underwriters paid AGIP up to policy limits for damage to the jacket under builder's risk policy SJ0002 and excess policies SJ0003A and SJ0003B. Underwriters brought suit in the name of AGIP on September 30, 1994, in No. H–94–3382, claiming subrogation rights against Gulf Island for the insured loss. On October 18, 1994, invoking this court's admiralty jurisdiction and its federal question jurisdiction based on the Outer Continental Shelf Lands Act (OCSLA), AGIP brought suit in No. H–94–3547 against McDermott, Snamprogetti, Gulf Island, and Petro–Marine, alleging negligence, gross negligence, products liability, breach of contract, and breach of warranty. AGIP seeks recovery from the parties for uninsured losses—actual compensatory damages, including lost revenue from delayed oil and gas production, as well as punitive damages. On February 17, 1995, No. H–94–3547 was consolidated into No. H–94–3382.

## 2. *The Standard for Summary Judgment*

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams*, 836 F.2d 958, 960 (5th Cir.1988). Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514–15; *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). The controverted evidence must be viewed in the light most favorable to the non-movant and all reasonable doubts must be resolved against the moving party. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990); *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14. Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to nonmovant's case on which it bears the burden of proof at trial. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552–53.

## 3. *AGIP's Tort Claims*

The defendants argue that AGIP's claims for lost revenues from delayed oil and gas production under theories of negligence, gross negligence, and products liability are

precluded by the "economic loss" rule recognized in admiralty. Defendants' arguments are premised on the assumption that AGIP's cause of action arises under maritime law. AGIP, on the other hand, contends that these claims are not barred because they arise under OCSLA, which applies the law of the adjacent state, here, Louisiana, a jurisdiction that has not adopted the "economic loss" rule.

### A. Choice of Law

■■■ The purpose of OCSLA is to define a body of law to apply to the seabed, the subsoil, and the fixed structures on the outer Continental Shelf. *Rodrigue v. Aetna Cas. and Sur. Co.*, 395 U.S. 352, 355, 89 S.Ct. 1835, 1837, 23 L.Ed.2d 360 (1969). OCSLA states:

> The Constitution and laws and civil and political jurisdiction of the United States are hereby extended to the subsoil and seabed of the outer Continental Shelf and to all artificial islands, and all installations and other devices permanently or temporarily attached to the seabed, which may be erected thereon for the purposes of exploring for, developing, or producing resources therefrom.

43 U.S.C. § 1333(a)(1); *see also Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 480, 101 S.Ct. 2870, 2876, 69 L.Ed.2d 784 (1981). OCSLA further provides:

> To the extent they are applicable and not inconsistent with this subchapter or with other Federal laws ... the civil and criminal laws of each adjacent State, ... are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf....

43 U.S.C. § 1333(a)(2)(A). Under OCSLA, the law of the adjacent state is controlling as surrogate federal law with respect to fixed platforms located on the shelf to the exclusion of admiralty and common law. *Rodrigue*, 395 U.S. at 355, 89 S.Ct. at 1837;

*Grover v. Exxon Corp.*, 894 F.Supp. 291, 294 (S.D.Tex.1995). For OCSLA to apply:

> 1) the controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto);
>
> 2) federal maritime law must not apply of its own force; and
>
> 3) the state law must not be inconsistent with federal law.

*Dupre v. Penrod Drilling Corp.*, 993 F.2d 474, 476 (5th Cir.1993); *Dupont v. Sandefer Oil & Gas, Inc.*, 963 F.2d 60, 61 (5th Cir. 1992); *Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459 (5th Cir.1992); *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043, 1047 (5th Cir.), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990); *Bonnette v. Shell Offshore, Inc.*, 838 F.Supp. 1175, 1181 (S.D.Tex.1993). OCSLA provides a plaintiff an action in negligence, strict liability, or contract, which would be cognizable under the law of the adjacent state. *Bourg v. Texaco Oil Co., Inc.*, 578 F.2d 1117, 1120 (5th Cir.1978).

■■■ Offshore drilling is not an activity that falls within the ambits of traditional maritime activity. *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 421, 105 S.Ct. 1421, 1426, 84 L.Ed.2d 406 (1985). The building of an oil rig derrick, likewise, is not considered to be maritime activity. *Molett v. Penrod Drilling Co.*, 826 F.2d 1419, 1426 (5th Cir.1987), *cert. denied*, 493 U.S. 1003, 110 S.Ct. 563, 107 L.Ed.2d 558 (1989). In fact, OCSLA provides:

> The term "development" means those activities which take place following discovery of minerals in paying quantities, including geophysical activity, drilling, platform construction, and operation of all onshore support facilities, and which are for the purpose of ultimately producing the minerals discovered.

43 U.S.C. § 1331(1). There are, however, two types of offshore oil rigs—fixed and floating. *Herb's Welding, Inc.*, 470 U.S. at 417 n. 2, 105 S.Ct. at 1424 n. 2. A fixed platform is considered to be an artificial island which is to be treated as a "federal enclave in an upland state." *Bonnette*, 838

F.Supp. at 1184 (citing *Rodrigue*, 395 U.S. at 355, 89 S.Ct. at 1837). Thus, fixed drilling platforms do not fall within the realm of admiralty jurisdiction. *Rodrigue*, 395 U.S. at 360, 89 S.Ct. at 1839 (citing *Phoenix Constr. Co. v. The Steamer Poughkeepsie*, 212 U.S. 558, 29 S.Ct. 687, 53 L.Ed. 651 *aff'g*, 162 F. 494 (S.D.N.Y.1908)). Admiralty law, however, applies to submersible, semi-submersible, jack-up, and other movable rigs located on the outer continental shelf. *See, e.g., Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1119 (5th Cir.1995); *Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 395 (5th Cir.1991), *cert. denied*, 502 U.S. 1033, 112 S.Ct. 874, 116 L.Ed.2d 779 (1992); *Houston Oil & Minerals Corp. v. American Int'l Tool Co.*, 827 F.2d 1049, 1052 (5th Cir.1987), *cert. denied*, 484 U.S. 1067, 108 S.Ct. 1031, 98 L.Ed.2d 995 (1988); *Vickers v. Chiles Drilling Co.*, 822 F.2d 535, 537 (5th Cir.1987). In the case at bar, the dispute centers around a jacket for a fixed platform that fell over in navigable waters forty-three miles off the Louisiana coast. Thus, the first requirement to invoke OCSLA jurisdiction—that the dispute arise on a OCSLA situs—has been satisfied.

■ Under OCSLA's second requirement, federal maritime law must not apply by its own force. In order to invoke admiralty jurisdiction in a tort case, the requirements of locality and nexus must be satisfied. Recently, the United States Supreme Court clarified this test. *See Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, —— U.S. ——, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). Under the locality test, the damage or injury must take place on navigable waters or, if the injury occurred on land, then it must have been caused by a vessel on navigable waters. *Id.* at ——, 115 S.Ct. at 1048. The connection test requires a two-part inquiry. First, the court must " 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' " *Id.* at ——, 115 S.Ct. at 1048 (citing *Sisson v. Ruby*, 497 U.S. 358, 363, 110 S.Ct. 2892, 2896, 111 L.Ed.2d 292 (1990)); *Coats*, 61 F.3d at 1118–19. This requires an evaluation of the potential for disruption, not a determination of whether

there was actual disruption. *Jerome B. Grubart, Inc.*, —— U.S. at ——, 115 S.Ct. at 1051 (citing *Sisson*, 497 U.S. at 362, 110 S.Ct. at 2895).

■ The second inquiry is that the "court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.' " *Id.* at ——, 115 S.Ct. at 1048 (citing *Sisson*, 497 U.S. at 364–365 n. 2, 110 S.Ct. at 2896–2897 n. 2); *Coats*, 61 F.3d at 1119. The court's inquiry is "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the case at hand." *Jerome B. Grubart, Inc.*, —— U.S. at ——, 115 S.Ct. at 1051; *Coats*, 61 F.3d at 1119. The substantial relationship test is satisfied when at least one of the alleged tortfeasors was engaged in activity "substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." *Jerome B. Grubart, Inc.*, —— U.S. at ——, 115 S.Ct. at 1052. The court need only look to "whether one of the arguably proximate causes of the incident originated in the maritime activity of a tortfeasor: as long as one of the putative tortfeasors was engaged in traditional maritime activity the allegedly wrongful activity will 'involve' such traditional maritime activity and will meet the second nexus prong." *Id.* at ——, 115 S.Ct. at 1052.

The first requirement to invoke admiralty jurisdiction in a tort claim—that the incident must occur on navigable waters—is satisfied. As noted above, the collapse of the jacket occurred in the Gulf of Mexico, forty-three miles off the Louisiana coast. The second requirement to invoke admiralty jurisdiction is there must be a connection to traditional maritime activity. The first part of that inquiry—that there is potentially disruptive impact—is also fulfilled. The collapse of the jacket had the potential to disrupt maritime commerce in the area of the Gulf of Mexico where it occurred. It need not be shown that the jacket's falling over actually disrupted any maritime commerce within the vicini-

ty of the platform, only that the potential for a disruptive impact existed.

As noted above, Snamprogetti, Gulf Island, and Petro–Marine's obligations involved the design and construction of the jacket. Snamprogetti had the responsibility for procurement activities and supervision of the construction of the jacket. The contract for Procurement Activities and Work Supervision between AGIP and Snamprogetti provides:

> 1.1 *Scope of Work*
>
> CONTRACTOR, as an independent CONTRACTOR, undertakes and agrees to perform all Work (as defined in Section 1.2.9), for the Platform, and to supply COMPANY with all reports, drawings, specifications and other documentation as defined herein.

Attachment 4 to the contract between AGIP and Snamprogetti further states:

> The CONTRACTOR is employed in the Engineering and Design as well as Procurement and Work Supervision Phases of this Project as an Independent Contractor.

The contract for Detailed Design and Engineering between AGIP and Snamprogetti also provides:

> 1.1 *Scope of Work*
>
> CONTRACTOR, as an independent CONTRACTOR, undertakes and agrees to perform all detailed design, engineering and related services for the Grand Isle 102—Platform "A".…

Under its contract with AGIP, Gulf Island was to fabricate the platform jacket. As stated by its contract for Detailed Design and Engineering:

> 2.0 CONTRACTOR shall provide all labor, supervision, equipment, machinery (fully maintained and operational), material not provided as COMPANY Furnished Materials and Equipment, all consumables and supplies, all fabrication support, engineering, procurement, storage and handling, transportation and drayage, fabrication support, load-out and seafastening services, required for delivery to COMPANY of Fabrication of the Jacket and Pile.…

Snamprogetti hired Petro–Marine to design the jacket. The contract between Snamprogetti and Petro–Marine describes Petro–Marine's obligations in the platform project:

> 1.1 *Scope of Work*
>
> SUBCONTRACTOR, as an independent SUBCONTRACTOR, undertakes and agrees to perform all detailed design, engineering and related services for the Grand Isle 102—Platform "A".…

Moreover, the contract for General Cost Estimate & Conceptual Design between AGIP and Petro–Marine provides:

> *ART. 1—PURPOSE OF CONTRACT*
>
> To provide a general cost estimate for 3–leg, 4–leg and 6–leg platforms for development of the hydrocarbon reserves on Grand Isle Block # 102. A conceptual design is also to be provided on one of these configurations.…

■ These contracts demonstrate that Snamprogetti, Gulf Island, and Petro–Marine's respective obligations were for the design and construction of the jacket for a fixed drilling platform. This activity is not considered a traditional maritime activity giving rise to admiralty jurisdiction. *See Molett,* 826 F.2d at 1426. Indeed, a dispute arising out of the construction of a fixed platform comes within the range of controversies Congress expected to be addressed under OCS-LA. *Laredo Offshore Constrs., Inc. v. Hunt Oil Co.,* 754 F.2d 1223, 1229 (5th Cir.1985).

McDermott's activity in the platform development project, as stated in the contract for Offshore Transportation and Installation between AGIP and McDermott, was supplying vessels and providing transportation and installation services:

> 2.0 *SCOPE OF WORK OVERVIEW*
>
> 2.1 CONTRACTOR shall provide all labor, supervision, equipment, machinery (fully maintained and operational), material not provided as COMPANY Furnished Materials and Equipment, all consumables and supplies, and engineering as required for delivery to COMPANY of transportation and installation services to deliver and install the Jacket, Piles and Deck from the fabricators'

yards, and the drilling rig, to the final location at Grand Isle Block 102–A. . . .

Paragraph 2 of attachment "A" to the contract between AGIP and McDermott further provides:

4.2  *INSTALLER Scope of WORK*

4.2.1  The INSTALLER Scope of WORK consists of the following:

● Transportation, from the DRILLING CONTRACTOR's site to the offshore installation location, and installation onto the platform deck of the drilling packages. . . .

● Seafastening engineering;

● Transportation of all drilling packages;

● Lifting, installation and setting onto the platform deck of the drilling packages;

● Barge(s) ballasting during transportation and installation phases.

＊　　＊　　＊　　＊　　＊　　＊

4.2.3  INSTALLER shall provide suitable transportation barge(s), tugs, all labor, materials, construction equipment, supplies and support services for the offshore transportation of the above mentioned items.

4.2.4  INSTALLER shall provide suitable crane barge, all labor, materials, construction equipment, supplies and support services for the offshore installation of the above mentioned items.

4.2.5  INSTALLER shall provide all certified slings and shackles, tugs, cargo barge(s), crane barge, material barges and other marine equipment required to transport and install on platform all drilling packages and materials from DRILLING CONTRACTOR's site to the offshore installation location. All marine transportation equipment shall meet U.S. Coast Guard requirements determined by an independent Marine surveyor provided by COMPANY.

▇▇ The application of maritime law " 'may turn on whether the particular contractor furnished a 'vessel' in connection with his work.' " *Freeport McMoRan Resource Partners, L.P. v. Kremco, Inc.,* 827 F.Supp. 1248, 1252 (E.D.La.1993) (citing *Lewis v. Glendel Drilling Co.,* 898 F.2d 1083, 1087

(5th Cir.1990)). Contracts focusing on the use of a vessel are considered maritime in nature. *See Dupre,* 993 F.2d at 477; *Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 459–60 (5th Cir.1992); *Lewis,* 898 F.2d at 1086. A contract, however, is not maritime merely because a party supplies a vessel in its performance of the contract. *Domingue,* 923 F.2d at 396. Only where a party's obligation for supplying a vessel is more than incidentally related to its contractual duties, is the contract considered to be maritime. *Id.* at 396–97.

In this situation, McDermott's duties were centered around providing barges and tugs to transport and install the jacket offshore. McDermott's supplying of vessels was related more than incidentally to its performance under its contract. Thus, McDermott's involvement in connection with the platform project was maritime in nature.

▇▇▇ With regard to the second part of the substantial relationship test, although Snamprogetti, Gulf Island, and Petro–Marine's activities relating to the construction of the platform jacket would not satisfy the substantial relationship test, one tortfeasor's involvement in traditional maritime activity, which is alleged to be a proximate cause of the incident, is sufficient to invoke admiralty jurisdiction as to the other defendants. *Jerome B. Grubart, Inc.,* —— U.S. at ——, 115 S.Ct. at 1051. Here, McDermott's involvement in the platform project has a sufficient maritime nexus to satisfy the substantial relationship test, and AGIP has alleged that McDermott's transporting and installing the jacket was a proximate cause of the collapse of the jacket. Thus, because McDermott, one of the alleged tortfeasors, was engaged in a traditional maritime activity, the nexus to traditional maritime activity has also been satisfied as to Snamprogetti, Gulf Island, and Petro–Marine. Hence, the second requirement necessary to invoke OCSLA jurisdiction has not been met because admiralty law is applicable by its own force to AGIP's claims for negligence, gross negligence, and products liability.

### B. *Economic Loss Rule*

■ While products liability claims are viable under general maritime law, the damages recoverable may be limited. *See East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 865, 106 S.Ct. 2295, 2299, 90 L.Ed.2d 865 (1986); *Gulf Boat Marine Servs., Inc. v. George Engine Co., Inc.*, 659 F.Supp. 6, 7 (E.D.La.1986). The United States Supreme Court has held that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." *East River S.S. Corp.*, 476 U.S. at 871, 106 S.Ct. at 2302. Thus, whether a products liability claim is asserted under a negligence, including gross negligence, or strict liability theory, no cause of action is available if the claimed injury is solely economic in nature. *Id.* at 876, 106 S.Ct. at 2304; *see also Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 767 (5th Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 77, 107 L.Ed.2d 43 (1989). Where the only claim for damage is economic loss, the plaintiff has lost the benefit of the bargain, and the remedies are limited to contractual warranties. *Petroleum Helicopters, Inc. v. Avco Corp.*, 930 F.2d 389, 392 (5th Cir.1991) (citing *East River S.S. Corp.*, 476 U.S. at 872–76, 106 S.Ct. at 2302–04).

■ AGIP argues that because *East River S.S. Corp.* addressed a products liability claim involving components combined to create a single product, it is inapplicable to Snamprogetti and McDermott because there is no contention that they manufactured a defective product. Rather, Snamprogetti and McDermott supplied services in connection with the manufacture of the jacket. The Fifth Circuit, however, has expressly held that the principle established in *East River S.S. Corp.* also applies to contracts for professional services rendered in connection with the manufacture or construction of a product. *See Suwannee River Spa Lines, Inc.*, 866 F.2d at 766. In *Suwannee*, the court stated that "[c]reating an exception to the economic loss rule for professional services when those services are performed 'only in the process of manufacturing or constructing a product' would 'effectively evis-

cerate the economic loss rule' adopted in *East River*." *Id.* at 766 (citing *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 950 (11th Cir. 1982)). Consequently, the economic loss rule applies to AGIP's tort claims against Snamprogetti and McDermott as well as to its tort claims against Gulf Island.

The economic loss rule also applies to subcontractors, such as Petro–Marine, who are not in privity with the purchaser. *McDermott, Inc. v. Clyde Iron*, 979 F.2d 1068, 1078 (5th Cir.1992), *rev'd in part on other grounds*, 511 U.S. 202, 114 S.Ct. 1461, 128 L.Ed.2d 148 (1991). "Under *East River* there is " 'no rational reason to give the buyer greater rights to recover economic losses for a defect in the product because the component is designed, constructed, or furnished by someone other than the final manufacturer.' " *Id.* at 1078 (citing *Shipco 2295, Inc. v. Avondale Shipyards, Inc.*, 825 F.2d 925, 929 (5th Cir.1987), *cert. denied*, 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 701 (1988)). In any event, with respect to Contract No. DIY0023 for General Cost Estimates and Conceptual Design, AGIP contracted directly with Petro–Marine, making it a contractor as well as a subcontractor.

■ Here, AGIP is claiming damages for, among other things, lost revenues from delayed oil and gas production occasioned by the necessity of retrieving, repairing, and repositioning the jacket before commencing production. When the jacket toppled over, the only physical damage was to the jacket itself. No damage was sustained by any other part of the platform, and no personal injuries were sustained by any of the workers. Under *East River S.S. Corp.*, AGIP may not recover damages for lost revenues due to the economic loss rule.

### C. *Damages Limited by Contract*

Moreover, AGIP may not recover any damages arising in negligence or strict liability that are contractually limited. The defendants' contracts limit their liability to AGIP. For example, clause 3.7 of the contract for Procurement Activities and Work Supervision between Snamprogetti and AGIP provides:

3.7 *Consequential Damages*
    CONTRACTOR shall have no liability to COMPANY and COMPANY shall have

no liability to CONTRACTOR for special, punitive, indirect or consequential damages; including, but not limited to, loss of capital, loss of product, loss of profit or loss of use, whether arising in this Contract, tort, warranty or strict liability.

The contract for Off Shore Transportation and Installation between AGIP and McDermott states:

9.0 *WARRANTY*

The above undertakings are in lieu of any other Warranty of materials or workmanship by CONTRACTOR and all implied warranties including any of the merchantability, fitness for purpose or workmanlike performance are excluded. All defects in the Work whether or not due to CONTRACTOR's negligence and all claims relating to defects in the Work, whether arising in contract, tort (including negligence), strict liability, product liability or otherwise, shall be subject to the agreements and limitations of this section.

\* \* \* \* \* \*

38.0 *CONSEQUENTIAL DAMAGES*

COMPANY and CONTRACTOR waive and release any claim against the other for consequential damages, however and whenever arising under this Agreemet [sic] or as a result of or in connection with the work, and whether based on negligence, unseaworthiness, breach of warranty, breach of contract, strict liability or otherwise.

Consequential damages shall include but not limited to loss of revenue, profit or use of capital, production delays, loss of product, reservoir loss or damage, losses resulting from failure to meet other contractual committments [sic] or deadlines and downtime of facilities or vessels.

The contract between AGIP and Gulf Island provides:

9.0 *WARRANTY*

CONTRACTOR's obligations under this Warranty paragraph shall be as indicated herein and no other warranties shall apply, implied or expressed, nor except as expressly provided in this CONTRACT shall CONTRACTOR be liable for any consequential or special damages, including by not limited to loss of use and/or loss of profits.

Under admiralty law, clauses limiting liability for negligence and strict liability are valid and enforceable. *See, e.g., Nicor Supply Ships Assocs. v. General Motors Corp.*, 876 F.2d 501, 504 (5th Cir.1989); *Arcwel Marine, Inc. v. Southwest Marine, Inc.*, 816 F.2d 468, 471 (9th Cir.1987), *cert. denied*, 484 U.S. 1008, 108 S.Ct. 704, 98 L.Ed.2d 655 (1988); *Coastal Iron Works, Inc. v. Petty Ray Geophysical, Div. of Geosource, Inc.*, 783 F.2d 577, 580–83 (5th Cir. 1986); *M/V Am. Queen v. San Diego Marine Constr. Corp*, 708 F.2d 1483, 1488 (9th Cir. 1983). Such clauses, however, may not limit liability for conduct rising to the level of gross negligence. *Todd Shipyards Corp. v. Turbine Serv., Inc.*, 674 F.2d 401, 411 (5th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982); *Lykes Bros. S.S. Co. v. Waukesha Bearings Corp.*, 502 F.Supp. 1163, 1172 (E.D.La.1980). Although it is unclear what damages AGIP seeks other than those due to delayed production, AGIP may, nevertheless, pursue damages, if any, caused by the defendants' alleged gross negligence resulting in losses that are other than purely economic in nature. A limitation of liability for gross negligence or willful conduct is likewise prohibited under Louisiana law. *See, e.g.,* La.C.C. art. 2004; *Broom v. Leebron & Robinson Rent–A–Car, Inc.*, 626 So.2d 1212, 1216 (La.App. 2d Cir.1993); *Sevarg Co., Inc. v. Energy Drilling Co.*, 591 So.2d 1278, 1281 (La.App. 3d Cir.1991), *writ denied*, 595 So.2d 662 (La.1992); *Banner Chevrolet v. Wells Fargo Guard Servs.*, 508 So.2d 966, 967 (La.App. 4th Cir.1987).

Thus, summary judgment should be granted in favor of McDermott, Snamprogetti, Gulf Island, and Petro–Marine on AGIP's claims for lost production revenues and other purely economic losses under theories of negligence, gross negligence, and products liability. Summary judgment, likewise, should be granted in favor of McDermott, Snamprogetti, Gulf Island, and Petro–Marine on all tort

claims seeking damages limited by the parties' contracts, except those stemming from gross negligence or willful misconduct. With respect to AGIP's claims for actual compensatory damages resulting from gross negligence or willful misconduct, summary judgment should be denied.

### 4. AGIP's Contract Claims

AGIP also brings claims for breach of contract and breach of warranty. The defendants contend that in the absence of any tort liability, the rights and obligations of the parties are defined by the terms of their contracts with AGIP. They assert that the contractual provisions in their respective contracts with AGIP limiting their liability to AGIP are valid and enforceable under admiralty law and bar AGIP's contract claims. AGIP, however, argues that these claims are controlled by Louisiana law through OCSLA, which provides that contract provisions excluding liability for gross negligence and willful conduct are void. AGIP also maintains that because Petro–Marine was not a party to the contract between AGIP and Snamprogetti, it may not seek to limit its liability based upon that contract.

#### A. Choice of Law

In a contract dispute, the court looks at the principal obligation under the contract to determine whether maritime law applies. *Dupont,* 963 F.2d at 62; *Domingue,* 923 F.2d at 396. The application of maritime law is precluded except where the subject matter of the controversy is significantly related to traditional maritime activities necessary to invoke admiralty jurisdiction. *Laredo Offshore Constrs., Inc.,* 754 F.2d at 1231; *see also Hollier v. Union Texas Petroleum Corp.,* 972 F.2d 662, 665 (5th Cir.1992). The location of the execution or performance of the contract does not alter the contract's maritime status or lack of such status. *Dupont,* 963 F.2d at 62; *Domingue,* 923 F.2d at 396.

As previously noted, the construction of an oil rig derrick is not traditional maritime activity. *Molett,* 826 F.2d at 1426. In fact, a contract dispute arising out of the purportedly improper "construction of a fixed platform falls well within the range of legal controversies Congress expected and intended to be submitted to the district court for resolution under the Act." *Laredo Offshore Constrs., Inc.,* 754 F.2d at 1229. As the contracts above reflect, Gulf Island's principal obligation was the fabrication of the jacket; Snamprogetti's primary duty was the supervision of the manufacture of the jacket; and Petro–Marine's obligation was the design of the jacket. Therefore, these activities fall under OCSLA, rather than admiralty jurisdiction.

Moreover, because OCSLA mandates that the law of the adjacent state is governing, contractual choice-of-law provisions are ineffective. *Matte v. Zapata Offshore Co.,* 784 F.2d 628, 631 (5th Cir.1986). Also, in view of the fact that a court applying the law of the adjacent state under OCSLA is applying it as federal law, "ordinary conflict of laws principles have no relevance." *Chevron Oil Co. v. Huson,* 404 U.S. 97, 102–03, 92 S.Ct. 349, 353, 30 L.Ed.2d 296 (1971); *see also Walter Oil & Gas Corp.,* 867 F.Supp. 549, 553 (S.D.Tex.1994). Thus, neither the choice-of-law provisions nor state conflicts rules apply to the contract disputes between AGIP and Snamprogetti, Gulf Island, and Petro–Marine.

As discussed above, however, a contract focusing on the supplying of vessels to transport and install the jacket is maritime in nature. *See Dupont,* 963 F.2d at 62; *Smith,* 960 F.2d at 459–60; *Lewis,* 898 F.2d at 1086; *Freeport McMoRan Resource Partners, L.P.,* 827 F.Supp. at 1252 (citing *Lewis,* 898 F.2d at 1087). A contract for services related to oil and gas exploration and drilling "takes on a salty flavor when the performance of the contract is more than incidentally related to the execution of the vessel's mission." *Domingue,* 923 F.2d at 396. In this case, McDermott's principal obligation was to supply vessels for transporting and installing the jacket. The provision of barges and tugs was more than incidentally related to McDermott's performance of its contractual obligations. Hence, maritime law applies to AGIP's contract claims against McDermott.

### B. Limitation of Liability

The defendants argue that because the provisions in their respective contracts limit their liability to AGIP, AGIP cannot now maintain its action for breach of warranty and contract. Under admiralty law, clauses limiting liability are valid and enforceable to the extent that they do not limit liability for gross negligence. *Todd Shipyards Corp.*, 674 F.2d at 411; *Lykes Bros. S.S. Co.*, 502 F.Supp. at 1172. Similarly, under Louisiana law, contractual provisions limiting liability, with the exception of gross negligence and intentional conduct, are valid. *See, e.g.*, La. C.C. art. 2004; *Broom*, 626 So.2d at 1216; *Sevarg Co., Inc.*, 591 So.2d at 1281; *Banner Chevrolet*, 508 So.2d at 967. Moreover, Louisiana recognizes a cause of action for the willful or deliberate disregard of a contractual duty for which liability may not be limited. *See Carriage Meat Co., Inc. v. Honeywell, Inc.*, 442 So.2d 796, 798 (La.App. 4th Cir. 1983).

Here, AGIP's contracts with the defendants, as set forth above, limit the defendants' liability to AGIP. Hence, as to any damages specifically excluded from liability, such as consequential damages, AGIP is barred from recovering under either a contract or breach of warranty theory unless they stem from the willful or deliberate disregard of a contractual duty by Snamprogetti or Gulf Island. AGIP, however, may pursue direct damages, if any, for breach of contract and breach of warranty that do not fall within the contractual limitations. Furthermore, AGIP is entitled to recover damages for any willful or deliberate breach of contract by Snamprogetti or Gulf Island. Accordingly, summary judgment should be granted in favor of Snamprogetti, Gulf Island, and McDermott against AGIP's contract and breach of warranty claims seeking consequential or other indirect damages except as premised on Snamprogetti or Gulf Island's willful or deliberate disregard of a contractual duty.

#### (1). Third Party Beneficiary

AGIP argues that because Petro–Marine is not a party to the contract between AGIP and Snamprogetti, Petro–Marine may seek protection under the contract only if Petro–Marine is an intended third party beneficiary under Louisiana law. Generally, the parties to a contract may stipulate only for themselves. *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 466 n. 30 (5th Cir.), *cert. denied*, 469 U.S. 1019, 105 S.Ct. 434, 83 L.Ed.2d 360 (1984). The parties to a contract, those holding under the parties by succession, assignment, or subrogation, and third party beneficiaries are the sole parties that have substantive rights under the contract. *Id.* Article 1978 of the Louisiana Civil Code provides that "[a] contracting party may stipulate a benefit for a third person called a third party beneficiary." *See Liquid Drill, Inc. v. U.S. Turnkey Exploration*, 48 F.3d 927, 931 (5th Cir.1995); *King v. Employers Nat'l Ins. Co.*, 928 F.2d 1438, 1442 (5th Cir. 1991). This is known as a *stipulation pour autrui*. *New Orleans Pub. Serv., Inc.*, 732 F.2d at 466 n. 30; *Rosenbloom v. Bauchat*, 654 So.2d 873, 876 (La.App. 4th Cir.), *writ denied*, 658 So.2d 1266 (La.1995).

The intent of the parties to the contract to create a *stipulation pour autrui* must be manifestly clear. *Chevron U.S.A., Inc. v. Traillour Co.*, 987 F.2d 1138, 1147 (5th Cir.1993); *see also Liquid Drill, Inc.*, 48 F.3d at 931. It is not required, however, that the contract specifically name the third party beneficiary, as the parties may stipulate for undetermined persons. *King*, 928 F.2d at 1442; *Dartez v. Dixon*, 502 So.2d 1063, 1066 (La.1987); *Andrepont v. Acadia Drilling Co.*, 255 La. 347, 231 So.2d 347, 352 (1969). In order for a *stipulation pour autrui* to exist, the benefit that the third party derives may not simply be incidental to the contract. *Chevron U.S.A., Inc.*, 987 F.2d at 1147; *New Orleans Pub. Serv., Inc.*, 732 F.2d at 467. Rather, the benefit to the third party must form a condition or consideration for the contract. *Chevron U.S.A., Inc.*, 987 F.2d at 1147; ·*Logan v. Hollier*, 699 F.2d 758, 759 (5th Cir.1983). The factors to consider in determining whether a contract provides a benefit to a third party are:

(1) the existence of a legal relationship between the promisee and the third person involving an obligation owed by the prom-

isee to the beneficiary which performance of the promise will discharge; (2) the existence of a factual relationship between the promisee and the third person, where (a) there is a possibility of future liability either personal or real on the part of the promisee to the beneficiary against which performance of the … [promisor] will protect the former; (b) securing an advantage for the third person may beneficially affect the promisee in a material way; (c) there are ties of kinship or other circumstances indicating that a benefit by way of gratuity was intended.

*Liquid Drill, Inc.,* 48 F.3d at 931.

■■■ In support of its contention that the contract for Detailed Design and Engineering between AGIP and Snamprogetti limits Petro–Marine's liability to AGIP, Petro–Marine points out the following clauses:

3.6 *Responsibility for COMPANY'S Property, Tools, and Equipment*

COMPANY agrees to defend, indemnify and hold CONTRACTOR, its … subcontractors … (hereafter collectively referred to as "CONTRACTOR Indemnities") free and harmless from and against any all claims, losses, costs, demands, damages, suits, judgments, penalties, liabilities, debts, expenses and causes of action and every other claim or litigation (including all costs thereof and attorney's fees), for any damage to, loss or destruction of any of COMPANY indemnities' property, tools or equipment employed in the construction of the Grand Isle 102 Platform as well as for any damage to, loss or destruction of COMPANY Indemnities' existing properties resulting from any cause including the sole, joint or concurrent negligence, in whole or in part, of CONTRACTOR, which may in any manner arise from, grow out of, or be incidental to, directly or indirectly, Work provided under this Contract, whether or not said claims are brought about by the negligence, in whole or part, including the sole negligence of CONTRACTOR Indemnities, or are based on strict liability, unseaworthiness or unairworthiness, even though either of these is occasioned by condi-

tions preexisting the date of this Contract.

\* \* \* \* \* \*

3.7 *Consequential Damages*

CONTRACTOR shall have no liability to COMPANY and COMPANY shall have no liability to CONTRACTOR for special, punitive, indirect or consequential damages; including, but not limited to, loss of capital, loss of product, loss of profit or loss of use, whether arising in Contract, Tort, Warranty or Strict Liability.

\* \* \* \* \* \*

3.9 *Warranty*

\* \* \* \* \* \*

Except as provided under the provisions of Sections 3.3., 3.4 and 3.10, the above-provided obligation to correct defective services shall constitute CONTRACTOR's Indemnities sole liability with respect to Work or any information supplied to the COMPANY, there being no other warranty nor liability, either express or implied.

Petro–Marine, as a subcontractor, is one of Snamprogetti's "Indemnities" for purposes of the indemnity and warranty clauses. The indemnity clause obligates AGIP to defend, indemnify, and hold harmless Snamprogetti and its indemnities, including subcontractors, from claims for damage to the property of AGIP's indemnities, including AGIP's parent, subsidiaries, contractors, and subcontractors. The warranty clause states that the liability of Snamprogetti's indemnities, including Petro–Marine, is limited to correcting defects in its services. Such provisions agreeing to defend, indemnify, and hold third parties free from harm for liability and limiting liability constitutes a stipulation for the direct benefit of such third parties, including Petro–Marine. Because these benefits are essential provisions of the contract, they are more than incidental to it. It would not matter that at the time AGIP and Snamprogetti entered into the contract, Petro–Marine had not yet been hired by Snamprogetti. *See King,* 928 F.2d at 1442; *Dartez,* 502 So.2d at 1066; *Andrepont,* 231 So.2d at 352. It is

only necessary that Petro–Marine be a third party beneficiary on the date the contract is to be effective for its benefit. *See Andrepont,* 231 So.2d at 352.

■ The warranty clause limits Petro–Marine's liability to AGIP. Because the consequential damages clause makes no provision for any parties in addition to the contractor, Snamprogetti, it does not apply to Petro–Marine as a subcontractor. Consequently, AGIP may recover damages against Petro–Marine based on contract claims not covered by the indemnity or warranty clause or that are premised on a willful or deliberate breach of contract. Thus, summary judgment should be granted in favor of Petro–Marine on AGIP's claims for damages that are precluded under the indemnity or warranty provisions in the contract between AGIP and Snamprogetti, unless they stem from Petro–Marine's willful or deliberate disregard of a contractual duty.

### 5. *Conclusion*

The defendants have established that AGIP may not recover under admiralty law for pure economic losses due to the delayed commencement of oil and gas production. Because no issues of material facts exist, the defendants' motions for summary judgment should be granted with respect to AGIP's tort claims seeking recovery for purely economic losses. With respect to AGIP's claims for actual compensatory damages, summary judgment should be granted on the negligence and the strict liability claims seeking recovery of special, punitive, indirect, or consequential damages and denied on gross negligence and intentional misconduct claims, unless they seek only economic losses. With respect to AGIP's claim for breach of contract and breach of warranty, the defendants' motions for summary judgment should be granted to the extent that the types of damages sought are contractually barred. Summary judgment should be denied on AGIP's claims for direct damages not limited by contract and for damages resulting from the willful or deliberate disregard of a contractual duty by Snamprogetti, Gulf Island, or Petro–Marine.

The parties have ten days from receipt to file specific, written objections to the memorandum and recommendation. Fed.R.Civ.P. 72. Failure to file objections may bar an attack on the factual findings on appeal. The original of written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208–1010. Copies of the objections must be mailed to the opposing party and to the chambers of the magistrate judge, P.O. Box 610070, Houston, Texas 77208–0070.